**MERCER v. NEW YORK TRAP ROCK CORPORATION.**

Civ. No. 9263.

United States District Court
E. D. New York.
April 13, 1950.

Abraham M. Fisch, New York City, (Arthur L. Obre, New York City, of counsel), attorney for plaintiff.

Hagen & Eidenbach, New York City, (Henry C. Eidenbach, and John F. Quarto, New York City, of counsel), attorneys for defendant.

BYERS, District Judge.

Decision was reserved at the close of the trial of this cause on March 20, 1950, of motions to set aside a plaintiff's verdict, and for a directed verdict in favor of defendant. Counsel were given until April 3rd to submit briefs with the trial minutes, and pursuant to telephone request, that time was extended to April 7th, on which day all briefs were filed.

This is a Jones Act case, 46 U.S.C.A. § 688, in which recovery of damages is sought by the Administratrix of Azariah Mercer, deceased, a bargee in defendant's employ, for his death which is said to have occurred on November 8, 1947, the allegations being:

"That on or about the 8th day of November, 1947, while the decedent, Azariah Mercer, was attempting to reach a scow upon which he was employed for certain purposes in the course of his employment he lost his balance and fell into the water and was drowned due to the fact that the defendant had failed to supply any light or artificial illumination which would have guided the decedent, Azariah Mercer, in reaching the scow on which he was employed."

That the place where the scow and others were located was in darkness, "making it unsafe and dangerous for Azariah Mercer and others to reach their various and respective scows."

That he was in the continuous employment of defendant whose duty it was to provide him "a safe and sufficient place in which to be employed and upon which to live."

That the defendant knowing that scow captains "would have social intercourse with each other which was in the line of duty failed to give that degree of safety to the decedent * * * which was customarily given in the Port of New York by scow owners to all scow captains similarly employed. That the defendant failed to take proper means and precautions to avoid the *happening of the accident* (italics supplied) failed to have that degree of illumination that other employers *under like circumstances* (italics supplied) customarily provided for their employees although defendant had notice of the fact that there was no light to guide the various captains on their journeys to and from their vessels."

It is also alleged that "On or about the 8th day of November, 1947, the decedent, Azariah Mercer, fell from a scow into the water and was drowned."

Only the proof for the plaintiff will be considered on this motion, and it may be briefly summarized as follows:

1. The decedent was scow master on the defendant's scow John Port which was one of a flotilla of about 19 light scows arriving at the defendant's quarry and plant at Tompkins Cove on the West Shore of the Hudson above Haverstraw on November 8, 1947, during the afternoon of that day, which was a Saturday. The scows were not to be loaded until the following Monday, as the plant did not operate on this Saturday.

2. The scows were moored in two tiers out from a timber structure built on piles, extending out into the river and which is called a walk-way. It is in effect a narrow pier, containing a 30″ planking for the use of those whose business takes them to and from the scows or barges. There is a hand-rail opposite the piles which rises perhaps three and one-half to four feet above the footway.

There is no testimony on the subject but from the photographs in evidence (Exhibits 2 and 3), it would seem that the tops of the sides of the scows when they are light, is about at the level of the walkway.

3. The out-river tier contained 10 scows which were separated by about two feet from one another, and held in place by fore and aft lines.

The inshore tier contained 9 scows similarly held, and there was open water between the two tiers of 8 to 10 feet. The out-river ends of these scows headed north, which means that the tiers extended easterly from the walkway.

4. Mercer's scow was the fourth from the walkway in the second tier directly ahead of the scow McKinstry, as the latter lay with her stern (cabin end) out-river. Her scow-master was Shea.

The third scow in the outboard tier was the Jack Fowler of which Hurst was scow-master. Her stern was inshore, which means that her cabin was near the open water between the tiers.

5. At about 6:30, Mercer, in company with Shea, and another scow-master named Horne, who was not called as a witness, went ashore to buy provisions; after making appropriate purchases they repaired to a bar-room where they watched a television and had four or five drinks "to my (Shea's) knowledge," which Shea says were beers.

6. They returned about 9 o'clock to the pier, and safely made their way to the cabin of the McKinstry as to Shea and Mercer; Horne went to his own scow—name not disclosed. Hurst, of the Jack Fowler, saw Shea and Mercer enter Shea's cabin on this occasion.

They remained in Shea's cabin until about 9:45 P.M., where Shea says they discussed a tide-table but had nothing to drink. Mercer left at about 9:45 carrying Horne's flashlight which Shea gave to him, and walked along the deck of Shea's scow, but where he went Shea did not know. Nor did he mention whether Mercer was carrying any provisions, or whether he had in fact purchased any. That is the last Shea ever saw of Mercer.

7. Shortly after 11 o'clock, Hurst, who was about to turn in for the night, and had put out his cabin light, saw a man pass in the dark, across the stern and of his scow (Jack Fowler) "onto the second boat from the dock." He was of the opinion (although he did not see his face) that this was Mercer, since he was tall and his appearance resembled that of Mercer. His testimony fell short of a clear identification, but he said he was of the strong belief that the man he saw at this time was indeed Mercer.

This testimony is at variance with a statement he signed on December 22, 1947, which he said was a correct version of his then recital, in which he said in part, "I saw a man cross the stern of my scow whom I did not recognize * * *. The last time I definitely saw the captain of the scow 'John T. Port' was when he went into the cabin of the scow 'DeWitt E. McKinstry' on the evening of November 8, 1947, as hereinabove explained." That statement was received in evidence, but was not read to the jury at the time; whether they examined it while deliberating does not appear.

Hurst's acquaintance with Mercer was limited: ("Well, I met him that year, I spoke to him three or four times." Nor would he recognize Mercer's voice "at that time (when Shea and Mercer entered the former's cabin) in the night."

Mercer had been in the defendant's employ for about five months only prior to the night in question, which explains perhaps why he was not better known to Hurst.

8. Some time after 11 o'clock (Hurst's statement makes it 11:30) he heard a man cry for help, he heard the word "help"

three times; he took his flashlight and looked around in the water along the boats, that is, "between the second boat from the dock—between the two tiers * * * but I saw nobody."

"It appeared that it came from toward the catwalk, but it wasn't over there. The echo seemed to come from that way." He heard nothing more for a few moments, returned to his cabin, "and heard it (the echo?) again," when it seemed to be weakening. He went over again "and looked over the two boats, my boat and the next one, and I didn't see anything." He did not cry out to answer the call for help; he did not arouse anyone else, and his conduct was consistent with a belief that what he heard was of no particular importance.

There was a brisk wind blowing (i. e., N.W. 6 P.M., 33 M.P.H. down to 17 at 11 P.M., as taken at Battery Place, New York) and the scows were moving up and down "six inches to a foot I would say." There was some bumping of the scows, which were mutually fended off with old automobile tires.

9. Mercer was never seen alive after the observations above recited, but his body was recovered from the Hudson River at Trap Rock beach about one mile across the river from Tompkins Cove, during the month of June, 1948, or about six months later.

10. On the night of November 8, 1947 there was no sufficient artificial light displayed at or near the shore end of the walkway to illuminate the decks of the fourth scows out from the walkway.

These scows were about 112 feet long and of about 34 feet in beam. So that the fourth scows out from the walkway were about 110 feet measured to the nearest side, from the walkway.

11. The scows carried lanterns for display when they were being towed at night, but not when they were moored as on November 8, 1947.

12. It was customary for the scow men to visit back and forth during their leisure hours and when not performing their duties at night, and they carried flashlights of their own to facilitate safe passage along the decks and between scows.

13. Mercer's movements between 9:45 P.M. and some time after 11 P.M. have not been disclosed, assuming that it was he whom Hurst saw passing aft of the cabin on the Jack Fowler.

14. It has not been shown that Mercer fell into the water anywhere at any time, because of the failure of the defendant to provide an artificial light that would illuminate the decks of the scows which have been referred to.

Hurst's testimony does not even establish that he heard cries for help from a voice he did not recognize coming from the water. Those cries could have come from the deck of another scow (since he says he was unable to see anyone in the water) or from the walkway itself.

If we knew what Mercer was doing between 9:45 and shortly after 11 o'clock the explanation of what happened to him might not be so completely shrouded in mystery. There were 18 other scows in this flotilla and whether he visited any of them has not been shown. Ten other scow captains seem to have been available at the time of trial, but none was called except Hurst and Peterson; the latter returned to his own scow at 2:30 in the morning of November 9th and had the assistance of the headlights of a taxi to illuminate the walkway, but whether he carried a flashlight is not stated.

This case has been considered in connection with Reck v. Pacific Atlantic, 2 Cir., 180 F.2d 866, and the cases therein cited concerning the scope of conjecture open to a jury where circumstantial evidence alone is available. These do not go so far as to suggest that the circumstances relied upon need present no element of apparent cause and effect.

There was no breach of custodial duty here, as in the Reck case, where the plaintiff's injuries were accounted for by the place where he was discovered after a two-hour search, at the bottom of an open hold.

Mercer was never seen in the water adjacent to these scows, and to the conjecture

as to why his body was found a mile distant from this place, some five months later, would have to be added the conjecture as to why he was in the water at all. The possible explanations are too varied to admit of support of any one so far as the evidence has been presented. In other words there is no testimony to support the allegation quoted from the complaint that Mercer "lost his balance and fell into the water and was drowned due to the fact that the defendant had failed to supply any light or artificial illumination which would have guided," etc.

The fact of the failure of illumination sufficient to play upon the decks of these scows in question is deemed to have been shown.

The fact that Mercer lost his balance has not been shown; the fact that he fell into the water at some undisclosed time and unidentified place may be assumed from the later finding of his floating body. But no association of these two incidents has been established, even if Hurst's trial version of his observations be given the most favorable interpretation, namely, that he saw Mercer pass astern of his cabin at about 11:15 P.M. and later heard an unidentified voice calling for help at around 11:30 o'clock. If that voice were indeed the voice of Mercer, whether he was calling from the water does not appear; indeed the inability of Hurst to see him there rather argues that he was elsewhere.

■ The case of West v. Eastern Transp. Co., 179 F.2d 478, 479, is enough like this so far as the apparent cause of death is concerned, to justify this quotation from the opinion: "Under the Jones Act, two requirements must be satisfied in order to maintain an action. (1) There must have been a negligent act on the part of defendant; (2) The act must have contributed to the injury (citing cases including DeZon v. American President Lines, Ltd., 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065).

■ Thus far it has been assumed for the purpose of discussion that such lighting as there was at the shore end of the walkway was insufficient to illuminate the decks of the eight scows lying closest thereto, and that this failure was negligent. No such holding is now made as a matter of law. The testimony of Shea that he had safely moved on and off his scows at this place in the hours of darkness for the past 18 to 20 years is practical evidence to the contrary.

Nor was there a showing as promised by the complaint of a recognized standard of illumination "under like circumstances," which this defendant failed to maintain. The testimony in that connection was not founded upon any showing of like circumstances, and was admitted over objection, and in anticipation that the deficiency would be later supplied, but that did not occur.

The second requirement that the assumed inadequate lighting contributed to the injury has not been met either by direct evidence, or by proof of circumstances which would support an affirmative inference to that effect for reasons which it has been the effort to make clear.

■ These views point to the necessity for granting the defendant's motion as contemplated by Federal Rules of Civil Procedure, rule 50(b), 28 U.S.C.A., reading, "* * * If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed."

Since this is a death case and the plaintiff was obviously at a disadvantage in the preparation of her case and by the lapse of time, it seems that the ends of justice will be served if a new trial is ordered so that every resource available to either party can be resorted to for the purpose of bringing to light all available testimony which could establish with reasonable certainty all that actually took place at the time and place in question.

The fact that I think the verdict was excessive has not influenced this decision.

Settle order.