Peder PEDERSEN, Plaintiff,

v.

DIESEL TANKERS, IRA S. BUSHEY,
INC., Defendants.

No. 64 AD 583.

United States District Court
S. D. New York.

Feb. 20, 1967.

———◆———

Paul S. Edelman, Kreindler & Kreindler, New York City, for plaintiff.

Thomas J. Irving, Foley & Martin, New York City, for defendants.

MOTLEY, District Judge.

### Findings of Fact

Plaintiff is a 47 year old seaman who has been going to sea since age 15. Beginning December 13, 1961, he was employed as a deckhand on the S. S. George Whitlock, a small tanker owned and controlled by defendant Diesel Tankers, Ira S. Bushey, Inc.

On January 5, 1962, the vessel loaded oil and proceeded to Port Jefferson, Long Island, arriving at the entrance to the harbor in the late afternoon shortly before 5:00 o'clock. Dead low tide that day was at 4:48 P.M. Despite the low water, the Captain (who had full discretion to wait longer) decided to take the tanker into the Swezey Oil Company dock to discharge his load. Official charts of the area indicate that the depth of the water around the dock at low tide is 11 feet. The draft of the tanker was 14 feet. As the vessel approached the dock it went aground at an angle, with the bow being closer to the dock than the stern.

From the bridge the Captain attempted to maneuver the vessel to the dock in such a position that the hose could be hooked up and the fuel discharged. He ordered plaintiff to put out a yellow polypropylene line from the forecastle head at the bow; plaintiff complied. The Captain then surged the vessel against this line, going forward and backwards, in order to force the stern closer to the dock.

The Captain was familiar with the characteristics of polypropylene lines, in relation to other lines used on vessels, namely that they were much more elastic, tended to jump and stick to the bitts. By the Captain's own admission, the polypropylene line is not the type of line to take a heavy strain or to be used as a "spring line." By "spring line" the Captain meant a line going from forward of the vessel to the dock backwards at an angle used to bring a vessel in closer to a dock by use of a vessel's power.

The general use of synthetic ropes was relatively new in the New York harbor area at this time. The S. S. George Whitlock had only been outfitted with polypropylene lines a short while. Plaintiff had not used this type of line before going aboard this vessel. However, he received neither instructions in handling this type of line, nor warnings about its potentially dangerous characteristics.

Plaintiff had the line wrapped around bitts on the bow of the vessel, with the after end of the line behind him. By this time of day it was dark and the Captain was using a searchlight to aid him in directing the docking maneuvers. This light was the only illumination and it was not played on plaintiff. As the Captain worked the engines, he put a heavy strain on the line plaintiff was tending. Had this line broken the tanker might have gone ahead and run into fuel lines at the adjoining dock. While the line was under this heavy strain, the Captain gave an order to slack off the line. As plaintiff let the line slacken, it whipped and struck plaintiff's left forearm, elbow and wrist with great force. The blow broke plaintiff's wrist watch and caused his arm to become red and swollen. The Captain had not been observing the strain put on the polypropylene line before the accident and did not actually see the line strike plaintiff. The Captain did, however, hear the line crack and turned to see plaintiff shaking his arm in apparent pain. Both the Captain and Donald Drotar, another hand on deck at the time, were aware of the accident immediately after its occurrence.

Plaintiff soaked his arm and had it bandaged soon after the accident, but did not get medical attention until January 17 when he came off the vessel and went

to the government clinic on Hudson Street.

Plaintiff received treatments at the government clinic during January and February of 1962. From March to July, 1962 for reasons of convenience, he received treatment from a private physician near his home in New Jersey. Defendant authorized this treatment, but so far has paid only part of the bill.

Plaintiff received further treatment at Hudson Street in July. He was an inpatient at the U. S. Public Health Service Hospital at Staten Island from August 13 to August 21, 1962 and from August 28 to September 28, 1962. The injury which plaintiff suffered on the vessel and which troubled him since the occurrence of the accident was diagnosed as a severe contusion of the left wrist and forearm with traumatic derangement and traumatic sinovitis in the left wrist. There was also a contusion of the left elbow with bursitis, superimposed on a previously existing olecranon spur. There was some indication of osteoporosis or demineralization of the bone. These conditions necessitated surgery which was performed at the hospital in Staten Island. Plaintiff was operated on for a bone marrow aspiration and excisions of the distal ulna and styloid of the left wrist, and an olecranon spur at the left elbow. Plaintiff was given a leather gauntlet at the hospital and future surgery for a wrist tendon operation was suggested as a possibility. After leaving the hospital in September, 1962, plaintiff had out patient treatment through May, 1963.

Plaintiff had a childhood injury to the left wrist, for which he had been treated but not hospitalized. In X-Rays it appeared as an old ununited fracture, but it was a long resolved injury by the time of the accident. At the time of the accident, plaintiff had worked as a seaman almost thirty years without any wrist disability.

Under plaintiff's union contract he is entitled to $8.00 per day while disabled, except for time spent as an inpatient in a government hospital. He has yet to receive any maintenance payments from his employer, though he made a demand at least as early as June 28, 1962. The defendant's knowledge of plaintiff's condition is reflected in the "sick" notation entered next to plaintiff's name in the employer's records some time after June 2, 1962.

Plaintiff first left the vessel May 26, 1962, but had a week's leave to June 2, 1962. He was out of work from June 2, 1962 to May 24, 1963 except for a period of February 21, 1963 to March 23, 1963 when he attempted to work.

Plaintiff earned about $10,000 per year, including overtime. He was making an average of $843.00 per month the year he was injured. He earned $10,034.55 in 1965—the first complete year that he worked since the injury.[1]

The reasonable value of the services of the private doctor who plaintiff saw with defendant's permission was $142.00. Defendant has paid $95.00 of this amount, but the balance of $47.00 is still due.

Although he has undergone surgery, plaintiff's injury will have permanent effects. He cannot man a vessel requiring a single deckhand and his overall power in his left grip is diminished.

*Conclusions of Law*

Jurisdiction of this court is based on the general maritime law of the United States and the Jones Act, 46 U.S.C. § 688.

Under the Jones Act, a seaman must satisfy two requirements in order to maintain an action: 1) there must have been a negligent action on the part of the employer; and 2) the act must have contributed to the injury. Mercer v. New York Trap Rock Corporation, 91 F.Supp. 434 (ED N.Y.1950). See, also, De Zon v. American President Lines, Ltd., 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065 (1943). There is an obligation on the part of the employer to see to the safety of the crew and the breach of that obligation is negligence. Koehler

1. There was a harbor strike in 1964 and plaintiff earned only $8,749.28 that year.

v. Presque-Isle Transp. Co., 141 F.2d 490 (2d Cir. 1944), cert. den. 322 U.S. 764, 64 S.Ct. 1288, 88 L.Ed. 1591. An officer who requires a seaman to do his work in a dangerous manner when there are other and safer ways to do it is negligent, having breached his duty to exercise reasonable care for the seaman's safety. Kangadis v. United States, 121 F.Supp. 842 (SD N.Y.1954), citing Reskin v. Minnesota Atlantic Transit Co., 107 F.2d 743 (2d Cir. 1939). The facts made out by plaintiff establish by a fair preponderance of the evidence that the defendant and its Captain were negligent under the Jones Act. The Captain brought the loaded vessel into a shallow water area and grounded it, knowing all the time that the tide was almost at dead low, and that the depth of the water around the dock, as indicated by his charts, was less than the draft of his vessel. In attempting to maneuver the grounded tanker, the Captain put too great a strain on the line which plaintiff was working. The Captain was fully aware that a polypropylene line of this type is highly elastic and has a tendency to stick to a bitt. He knew that it was not the type of line to be used as a spring line upon which great strain is placed. There was insufficient illumination to carry on docking procedures of this type at this time of day. The Captain's order to slacken the polypropylene line when he was unable to see the extent of the strain upon the line or the position in which plaintiff was placed by reason of the Captain's order, was negligent. It was also negligent, having a relatively new type of line with dangerous propensities aboard, to fail to instruct plaintiff in its use of that line when plaintiff had no prior familiarity with lines of this type.[2]

■ Plaintiff was not contributorily negligent. He was obeying orders from his Captain, and in this he does not assume the risk. Darlington v. National Bulk Carriers, Inc., 157 F.2d 817 (2nd Cir. 1946).

■ As far as damages are concerned, defendant is liable for injury to plaintiff caused by defendant's negligence. See, De Zon, supra. Some questions were raised about the relation of plaintiff's childhood wrist injury to injury sustained as a result of this accident. The court has found that the childhood injury had long been resolved at the time of this accident. In any case, it is a well settled principle that the defendant is chargeable for all the injury his negligent act brings on even though the plaintiff's injuries were aggravated by his own predisposition or weakness. See, Poplar v. Bourjois, Inc., 298 N.Y. 62, 80 N.E.2d 334 (1948).

■ In addition to his claim for negligence under the Jones Act, plaintiff has made a claim for maintenance and cure. Plaintiff is not required to elect between these claims. They are "consistent and cumulative." Pacific S. S. Co. v. Peterson, 278 U.S. 130, 49 S.Ct. 75, 73 L.Ed. 220 (1928). Of course, the amounts under both claims cannot be duplicated. Gypsum Carrier, Inc., v. Handelsman, 307 F.2d 525, 533, 4 A.L.R.2d 517 (9th Cir. 1962); Petition of Oskar Tiedemann and Co., 367 F.2d 498, 505 (Fn. 6) (3rd Cir. 1966).

■ Courts may adopt provisions of a union contract calling for a specific daily allowance for maintenance without proof of actual expenditure. Bartholomew v. Universe Tankships, Inc., 279 F. 2d 911 (2d Cir. 1960). However, a seaman cannot recover maintenance for free room and board received at a Marine Hospital. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938). Relying upon the authority of Vaughan v. Atkinson, 369 U.S. 527, 82 S. Ct. 997, 8 L.Ed.2d 88 (1962), plaintiff has asked that defendant be charged with a penalty for failure to pay maintenance and for attorney's fees due to failure to pay maintenance. While this decision has been given great scope by one or two district courts, see, Jordon v. Norfolk

---

**2.** A finding of liability under the Jones Act makes unnecessary any discussion of the unseaworthiness claims advanced by plaintiff.

Dredging Co., 223 F.Supp. 79 (E.D. Va.1963), the view taken by the Court of Appeals for this Circuit is that such fees should be allowed only where the employer is shown to have been "callous" or "recalcitrant" in refusing to pay maintenance. Roberts v. S. S. Argentina and Moore-McCormack Lines, Inc., 359 F.2d 430 (2d Cir.1966). The court finds that the failure to pay maintenance and relevant medical expenses here was not callous or recalcitrant on the part of the employer, but a result of an honest disagreement as to whether plaintiff was entitled to such payment. Therefore, plaintiff is denied any penalty or attorneys' fees.

The court finds that plaintiff is entitled to a decree as follows:

| | |
|---|---|
| Lost Wages | $9,273.00 |
| Living Allowance | 2,280.00 |
| Medical Expenses | 47.00 |
| Pain and Suffering, Permanent Impairment | 2,500.00 |
| Costs | |