John I. MARVIN, Plaintiff-Appellee,

v.

CENTRAL GULF LINES, INC., formerly Central Gulf Steamship Corporation, Defendant-Appellant.

No. 75–3759.

United States Court of Appeals, Fifth Circuit.

June 27, 1977.

Rehearing and Rehearing En Banc Denied Aug. 22, 1977.

---

**1296**

John O. Charrier, Jr., New Orleans, La., for defendant-appellant.

Bruce A. North, Malcolm E. Ziegler, New Orleans, La., for plaintiff-appellee.

Before WISDOM, GEE and FAY, Circuit Judges.

1. The eight-inch dimension being the circumference of the hawser, its diameter would have been something under three inches.

2. The fair lead was a vertical assembly on the deck consisting of a shaft and a freely rotating spool; a rope could be run around the fair lead without chafing, as it would on a stationary

GEE, Circuit Judge:

John I. Marvin, an experienced, able-bodied seaman, was a crewman on Central Gulf's S/S GREEN SPRINGS when the ship docked at Pusan, South Korea, on January 17, 1972. The GREEN SPRINGS was secured by bow and stern lines before it was decided that the ship was too far forward and should be moved some distance astern. Accordingly, the bow line was slacked and the stern line was moved to a bollard about 150 feet astern of the ship's original mooring point; from this bollard the line, an eight-inch hawser,[1] ran through the starboard bulwark of the ship, out onto the deck, forward to a fair lead[2] near the bow and around the fair lead and back some 40 feet astern to the starboard anchor windlass. The GREEN SPRINGS was to be moved backward under its own power by having the anchor windlass take in the stern line (a "spring line," as it is called). Marvin, whose duties included assisting in docking the ship, wrapped the hawser five or six turns around the windlass and took a position a few feet astern of it; by applying tension to the hawser as it came off the rotating windlass, he created sufficient friction for the windlass to take in the line. He could stop the process by releasing tension on the line, allowing the windlass to turn freely with the hawser slipping as it turned.

At some point in the backing of the ship Marvin was struck heavily in the face by what he believes to have been the hawser, snapping back in a sort of "slingshot" effect after slipping off the fair lead. Because his view of the fair lead was obstructed by the windlass, his testimony understandably was less than clear concerning the events which led to his injury. He did not see the hawser snapping back toward him before the force of the blow knocked him to the deck. His

shaft. The diagram drawn by Marvin when his deposition was taken indicated that the rotating spool was narrower in the middle than at either end, so that the hawser would tend to stay on the spool so long as sufficient tension was applied.

injuries were sufficiently severe that after he had received first aid below deck he was taken to a hospital in Pusan for treatment. Korean physicians initially sutured the lacerations in his face but did not realize that his cheekbone had been fractured until five or six days after Marvin entered the hospital, when his complaints of continuing pain led to an X–ray of his head and face. After thirteen days in the Pusan hospital, Marvin was flown back to New Orleans where doctors finally repaired his cheekbone with metal sutures and performed some plastic surgery.

Marvin was the sole witness at the trial below; at the conclusion of his testimony defendant Central Gulf moved unsuccessfully for a directed verdict in its favor.[3] *Res ipsa loquitur* was not pleaded, and the jury was not charged upon it. The jury found that the S/S GREEN SPRINGS was not unseaworthy, that Central Gulf had been negligent, that such negligence was a cause of Marvin's injuries, and that Marvin had suffered damages in the amount of $25,000. On appeal Central Gulf argues that, the evidence being insufficient to establish any specific negligence on its part, the motion for directed verdict should have been granted. We agree and thus do not address the other points raised in the briefs.

Although a Jones Act plaintiff suing in negligence shoulders a lighter burden than his counterpart on land would carry, G. Gilmore & C. Black, Admiralty §§ 6–35, 6–36 (2d Ed. 1975), we as an appellate court must still overturn a judgment based on a jury verdict in favor of the plaintiff "when there is a complete absence of probative facts to support the conclusion reached . . . .." *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, 923

(1946).[4] We look, then, for "evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn" to support the verdict and, thus, the judgment thereon. *Shulz v. Pennsylvania Railroad,* 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668, 671 (1956). Neither the testimony of Marvin nor the permissible inferences from that testimony supports the jury's finding that Central Gulf was negligent.

The record indicates two possible theories for finding actionable negligence on the part of Central Gulf in the docking maneuver during which Marvin was injured: the procedure employed, backing the ship using the power of its own anchor windlass to take in a spring line, may have been so inherently dangerous that its use constituted negligence in and of itself;[5] or, in the alternative, some employee of Central Gulf may have acted negligently in carrying out the operations. The evidence in the record could not support a jury finding against Central Gulf on the former theory, negligence inherent in the backing procedure employed, since no testimony was heard suggesting that backing the ship in this manner was a particularly dangerous or even unorthodox method. Indeed, Marvin himself indicated that he had on other occasions assisted in backing a ship in this way.[6] Absent any evidence that the method employed was itself in any way unusual or hazardous, and the matter being well beyond the ambit of common knowledge or judicial notice, the jury had no basis for finding that the Central Gulf employees in charge of the GREEN SPRINGS acted negligently in choosing to move the ship in this manner.

---

**3.** In denying the motion the district court said, "I think there may be just barely enough there to go to the jury."

**4.** *Lavender* was decided under the Federal Employers' Liability Act (FELA). The Jones Act incorporates the FELA standard for evaluating the strength of plaintiff's case. 46 U.S.C. § 688 (1970).

**5.** An officer who requires a seaman to do his work in a dangerous manner when there are

other and safer ways to do it is negligent, having breached his duty to exercise reasonable care for the seaman's safety. *Pedersen v. Diesel Tankers,* 280 F.Supp. 421, 424 (S.D.N.Y.1967).

**6.** Q: But isn't it true, sir, that every time a ship is backed down, using this technique, the line really gets under pressure?
A: It gets a reasonable amount on it, yes.

Under the remaining theory of recovery, Marvin's testimony points to his conclusion that the chief mate, who directed the backing operation, was negligent in failing to stop the process (as by instructing Marvin to slack the line) before the line slipped the fair lead and struck Marvin. We are forced to conclude that the evidence likewise failed to make out this ground of recovery. Even if we assume that Marvin's testimony was sufficient to establish that the line jumped the fair lead at all—at several points he seemed fairly sure,[7] but his equivocation at other times[8] removed much of the strength from his testimony—he was unable to offer any physically cogent reason *why* the spring line might have jumped the fair lead. Given such a plausible hypothesis, we might be able to find support for the jury's verdict by reasoning that the chief mate should have recognized the impending danger and stopped the operation and that he was negligent in failing to do so. Marvin's account offers his belief that the line slipped off because the backing procedure put too much tension on it;[9] but unless the hawser was being pulled *upward,* either from the windlass or from the other end (and there was no testimony to that effect), inordinate tension on the line would not tend to make it slip off.[10] Even if *on this occasion* tension *did* somehow cause the line to slip, we have no evidence on which to base a conclusion that the chief mate or any other employee should have seen that the accident was about to occur and acted accordingly. It may well be that the line did slip off; if so, something must have caused it, such as perhaps a sudden roll of the GREEN SPRINGS because of the wake of a passing boat. Again, however, with no evidentiary basis for such a conclusion we certainly have no way to guess whether anyone should have been cognizant of impending danger and should have told Marvin to slack the line.

Although no reported cases are directly in point, several decisions allowing recovery to a seaman injured by a sudden movement of a line or rope support our holding by illustrating a quantum of evidence entirely different from that in the case before us. In *Coyle Lines v. Dugas,* 196 F.2d 59 (5th Cir. 1952), a seaman, Dugas, was in the process of securing some tow lines on a tugboat (which was engaged in freeing grounded barges) when the captain of the tug gave the order to move forward, causing one line suddenly to go taut and hit Dugas in the face, fatally injuring him. The court upheld a jury verdict of negligence on the part of the tug company partly on the basis

7. Marvin described the accident several times on direct examination as follows: "And we were doing that under the orders of the Chief Mate and the line slipped off of the fair lead." "[T]he line was working under a heavy strain and for some reason or another the line slipped the fair lead." "At the time of the accident the line, it was extremely, overly tight and it slipped the fair lead." "[I]t slipped this fair lead under the heavy tension and it flew into my face and hit me."

8. On cross-examination, when asked whether he knew for sure that the line jumped the fair lead, Marvin answered as follows: "I know that something flew through the air and hit me and *I can only guess that it was the line come up on the drum and it must have been that the line came off.*" The questioning continued: "All you know is that something hit you?" Marvin replied, "Very much so, yes."

Later Marvin was asked: "If the line jumped the fair lead, Mr. Marvin, you cannot tell us, today, the reason it jumped the fair lead?" He answered, "No, I can only assume."

When deposed prior to trial, Marvin made it clear that he could only surmise that it was the hawser that hit him: "Well, *something hit me. I don't know what it was.* All I can say is something hit me, and the best thing I can see, it was a rope, mooring line did it."

9. *See, e. g.,* the testimony quoted in footnote 7, *supra.*

10. Tension would tend rather to snap the line completely. Marvin, in his deposition, testified that he first thought that the line had broken and that it was not until three or four days later that a co-worker told him that it had instead slipped, intact, off the fair lead. At trial he testified that immediately after the accident he knew that the line had slipped off and that in fact he had gotten up from the deck and replaced it on the fair lead before being led below deck.

of the captain's failure to see that Dugas was clear before making the line taut, on the strength of testimony that Dugas himself was supposed to give the signal to proceed and that he had not so signalled. In *Schybinger v. Interlake Steamship Co.,* 273 F.2d 307 (7th Cir. 1959), the plaintiff testified that he was injured when a winch cable flew up and struck him; he testified that the winch operator turned on the winch too fast so that the cable became taut as he stepped across it. Despite a good deal of conflicting testimony from other witnesses, the court held that the jury's verdict for the plaintiff was amply supported by his testimony. He had presented a viable explanation of how the accident occurred, and weighing the conflicting evidence was the proper function of the jury. *Clark v. Central States Dredging Co.,* 430 F.2d 63 (8th Cir. 1970), involved a seaman whose hand was crushed between an anchor cable and the bitt around which he was wrapping the cable. The jury's finding of negligence on the part of the defendant was amply supported by the seaman's testimony that the boat had been allowed to drift backward, causing the cable which he was wrapping suddenly to become taut and catch his hand. The plaintiff in *Pedersen v. Diesel Tankers,* 280 F.Supp. 421 (S.D.N.Y. 1967), sustained severe arm injuries when a polypropylene line suddenly whipped off of a bitt and hit him. The tanker on which he was working had a fourteen-foot draft and had come into a dock at low tide when the water depth was only eleven feet; the captain then attempted to maneuver the grounded tanker closer to the dock by surging it against a polypropylene line at the bow. Testimony showed that the captain knew that polypropylene was too elastic to be used as a spring line, that it tended to stick to a bitt, and further that the lines were new and plaintiff had not been instructed in their use. The captain nevertheless ordered plaintiff to slack the line, which was under great pressure, and plaintiff complied, to his injury.

In each of the foregoing cases the plaintiff seaman was able to present some evidence supporting some theory of negligence on the part of some employee for whose actions the employer was liable. Marvin has not presented any evidence which would support the conclusion that anyone concerned acted negligently in any specific manner while docking the S/S GREEN SPRINGS. All that he, the sole witness, could say was that in the course of a procedure not shown to be uncommon or improper the line somehow came loose and struck him. No evidence was even presented as to the manner in which this did or could have happened, let alone that it resulted from anyone's carelessness. We may speculate that Marvin released his end of the line or that some mighty heave of the ship somehow snubbed the line over the lip of the fair lead, but no evidence bases these speculations and they remain precisely that. In short, Marvin may have had a provable case, but he did not prove it. As we have noted, the burden of proving negligence and causation in a Jones Act case is a light one, but even at sea injury does not presuppose negligence. When, as here, the evidence does not justify a finding of negligence, we must reluctantly overturn the verdict. The judgment is

REVERSED.