607 F.2d 1034
 Annie McMILLAN, as Personal Representative of the Estate of
Edgar McMillan, Deceased, and on behalf of
herself, Individually, Plaintiff-Appellee,
v.
MARINE SULPHUR SHIPPING CORP., Defendant-Appellant.
 No. 11, Docket 79-7054.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 10, 1979.
Decided Oct. 9, 1979.
 
 Terence F. Gilheany, New York City (Cadwalader, Wickersham & Taft, New York City, John A. Sullivan, Peter G. Bergmann, and Carter B. Simpson, New York City, of counsel), for defendant-appellant.
 Richard H. Abelson, New York City (Semel, Patrusky & Buchsbaum, New York City, Alan H. Buchsbaum, and Alan M. Getzoff, New York City, of counsel), for plaintiff-appellee.
 Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 Plaintiff Annie McMillan, as personal representative of the estate of Edgar McMillan and in her own behalf, brought this wrongful death action under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), against defendant Marine Sulphur Shipping Corp. (Marine) in the District Court for the Southern District of New York. Section 905(b) allows an injured harbor-worker to sue a ship for negligence, subject to the provisions of 33 U.S.C. § 933, which protects the harbor-worker's employer or compensation insurer for amounts paid or payable by them. A jury rendered a verdict awarding plaintiff $48,206 for past and $143,577 for future lost wages and $300,000 for loss of consortium. Marine moved for judgment n. o. v. on the ground that plaintiff had failed to carry her burden of proving negligence as required by the statute and for a new trial. The court denied all of Marine's motions except to require a remittitur reducing the award for loss of consortium to $120,000. Plaintiff accepted the remittitur and final judgment was entered in the amount of $311,783, from which Marine appeals. Although many other interesting points have been presented,[1] our conclusion that it was error to deny the motion for judgment n. o. v. renders it unnecessary to discuss them.
 
 
 2
 The accident occurred during the docking of Marine's ship, the Marine Duval, an 11,000 ton tanker, at Gardinier Terminal in Tampa, Florida, on the evening of November 18, 1973. Plaintiff sought to establish Marine's negligence largely through the deposition of Chief Mate Hoffman who witnessed the end of the accident, a statement of AB Seaman Hardwick Cooper who ran the aft winch, a statement of Port Relief Mate Marion Wright who, serving in the capacity of night mate, supervised the aft line and winch, and the testimony of George W. Newman, former Captain of the Marine Duval, who exercised overall responsibility for docking on the night of the accident but did not witness it and was no longer in Marine's employ at the time of the trial.
 
 
 3
 There is little dispute over the basic facts: On the night of the accident, the Marine Duval was docking port side to the Gardinier terminal with the aid of her own engines and the assistance of two tugs, the 1,600 horsepower Tampa on the starboard bow and the 2,000 horsepower Montclair on the starboard quarter. The ship's engines were stopped minutes before the accident, leaving only the pressure of the tugs to push the ship laterally to port and, in the Chief Mate's recollection, at an even pace toward the pier. The forward and aft spring lines went out between 9:05 PM and 9:07 PM. Both lines were affixed to a single bollard on a "mooring island"[2] by four shoreside workers, one of whom was Edgar McMillan. The shoreside workers did not take the safety precautions of donning life preservers or removing their rubber boots. Three of them, however, moved away from the bollard once the lines were fastened, while McMillan continued to stand near the wires. The function of the spring lines was to hold the vessel in the proper fore and aft position while the tugs pushed her to the dock.
 
 
 4
 The aft spring line was payed out from the aft winch, which was operated by ABS Cooper under the supervision of the night mate, Port Relief Mate Wright. After the line had been affixed to the bollard and made taut, the winch was placed in a "stop" position. Cooper was near enough to the winch so that he could readily ease tension in the wire by paying out line but he received no direction and perceived no occasion to do so. At 9:10 PM, when the Marine Duval's portside came within one or two feet of the dock and six to nine feet of the bollard, the aft spring line parted,[3] struck Edgar McMillan and threw him into the water where he drowned.
 
 
 5
 At trial, plaintiff advanced the theory that the aft spring line parted after a build-up of excessive tension allegedly caused by defendant's failure to compensate for the movement of the ship in the operation of the aft winch and line. She endeavored to meet her burden of proof by attempting to show that defects in the line itself could not have caused the accident and then relying on opinion evidence to bridge the resulting explanatory gap and produce the inference that only defendant's negligence could have accounted for the parting of the line.
 
 
 6
 The testimony on the maintenance of the line and its condition both before and after the accident was uncontroverted. Chief Mate Hoffman stated in his deposition that it was his practice to inspect the Marine Duval's spring lines "(a)t least once a week" and to replace them if he discovered any defects. These weekly inspections included a search for rust or "dry spots," either of which might indicate deterioration, and an examination of the wire for crimps or broken strands. In addition, the lines were "slushed," or treated with a liquid preservative, on the average of once a week. Plaintiff also offered a statement of the bosun that during the month preceding the accident the crew had inspected and slushed the aft spring line, but had not "end-for-ended" it as had been done in September 1972.[4] Immediately after the accident the broken line was photographed and subjected to an initial examination. On the following morning Chief Mate Hoffman made a more thorough inspection of both ends of the broken line in the presence of Coast Guard officials. He concluded that there no defects, "bad areas" or crimps near the point of breakage although the line manifested normal wear. The line was also examined by the bosun and by Captain Newman who found the wire "in very good condition". A portion of the line was submitted to the American Bureau of Shipping for more thorough examination, but the results of this, if any, were not introduced in evidence.
 
 
 7
 In contrast to the abundant evidence on the maintenance and appearance of the line, support for the claim of operational negligence was exceedingly limited. When asked for his opinion why the wire parted, Captain Newman said, "Well, there was too much of a strain put upon it." He fleshed this out by explaining "the ship is such a large thing and the tonnage is so great that nothing, nothing could stand up . . . if that ship gets moving. There is no wire that could hold that ship." However, there was no evidence that the ship, whose engines had been stopped, was in fact moving when the line parted, save for the nearly completed movement toward the dock engendered by the tugs, which, of course, would diminish rather than augment any strain on the line. In addition Chief Mate Hoffman, whose deposition was offered by plaintiff, testified that a wire should not part under the conditions to which the aft spring line was subjected on the night of the accident and that such a break was not expectable. Lastly, ABS Cooper, who had the best opportunity of any of the witnesses to observe the aft line, said in a statement also offered by plaintiff "At no time did I notice any undue strain on the wire" and Port Relief Mate Wright, who supervised Cooper, neither testified at trial nor advanced an explanation for the parting of the wire in the brief statement which plaintiff offered in evidence.
 
 
 8
 In a statutory action by a harbor-worker or his representative against the ship under 33 U.S.C. § 905(b), plaintiff has the same burden of showing negligence as a land-based worker would have in a suit against any other party. See H.R.Rep.No. 92-1441, 92d Cong. 2d Sess., 1972 U.S.Code Cong. & Admin.News, pp. 4698, 4702-03. The nature of this burden is described in 1A Benedict, Admiralty § 118 at 6-25 (7th ed. 1979).
 
 
 9
 The plaintiff must establish directly or by just inference some want of care on the part of the master or the crew of the ship to which his injury may fairly and reasonably be traced. It is not enough for the plaintiff to prove that the negligence might perhaps have caused the injury. If the injury complained of might well have resulted from one of many causes, it is incumbent upon the plaintiff to produce evidence which will exclude the operation of those causes for which the master or the crew is under no legal obligation. If the cause of the injury may be as reasonably attributed to an act for which the master and crew are not liable as to one for which they are, the plaintiff has not sustained the burden of fastening tortious conduct upon the master or crew. The evidence showing negligence must come from witnesses who speak as knowers, not as guessers.
 
 
 10
 See also Mehra v. Bentz, 529 F.2d 1137, 1139 (2 Cir. 1975), Cert. denied, 426 U.S. 922, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976) (under both New York and federal negligence law, "(i)f the circumstantial evidence presented lends itself equally to several conflicting inferences, the trier of the fact is not permitted to select the inference it prefers, since to do so would be the equivalent of engaging in pure speculation about the facts"); Prosser, Torts § 39 at 211 (4th ed. 1971).[5]
 
 
 11
 Although the evidence of diligent maintenance and the results of the inspection of the aft spring line before and after the accident doubtless sufficed to relieve the shipowner of any liability for negligence based on the condition of the line a theory of liability which plaintiff did not advance it does not suffice to establish plaintiff's claim that negligent operation of the aft winch was the only or the most reasonable explanation for the parting of the line. Several competing inferences are equally plausible. One is the possibility of a latent defect, originating either during the manufacture or the subsequent heavy use of the wire, that may have been detectable only by laboratory methods and not by the naked eye. Such hidden defects are not unprecedented. For example, in Moore-McCormack Lines, Inc. v. I. T. O. Corp. of Baltimore, 508 F.2d 945 (4 Cir. 1974), a guy wire that passed visual inspection by a Department of Labor compliance officer was later found, during laboratory testing, to be heavily contaminated by salt and to contain a strand that broke "under a load far less than its nominal strength." Id. at 947, 948 n. 3. Here plaintiff did not offer the results of the ABS laboratory test. Another possibility is that the line just wore out. Captain Newman's opinion that the wire must have been subjected to excessive strain by a movement of the ship does not eliminate the possibility of a hidden defect or accumulated wear, particularly since his conclusion was predicated on his visual inspection of the wire and flies in the face of other evidence submitted by plaintiff herself, notably the statement of ABS Cooper. Chief Mate Hoffman's testimony suggested that unanticipated snapping of such wires most of them presumably well maintained was not infrequent. In addition, Captain Newman's opinion was unsupported by any evidence of ship movement in any direction other than even lateral progress toward the dock under the pressure of the tugs, which, as indicated, could only have Decreased the tautness of the line during the interval after it had been fastened to the bollard and the winch had been placed in the "stop" position. In an effort to overcome this evidentiary lacuna, plaintiff's brief in this court makes an extended argument that the Marine Duval may have been propelled away from the dock by a current or "shear."[6] Yet there was no evidence that there was any such current or shear, still less that anyone aboard the Marine Duval knew of it, and certainly none that this was known in time to pay out more line or that the probability of such a shear was so great as to require constant supervision of the line, even at a time when tension would be expected to decrease.
 
 
 12
 Even if we were to exclude the possibilities of a latent defect or accumulated wear, which we do not deem permissible for reasons stated above, negligent operation of the aft line and winch is not necessarily the most plausible inference that might be drawn from the record before us. In order to prove negligence plaintiff had to establish not only that the ship moved forward or to starboard and that this strained the aft line to its breaking point, but that such movement was sufficiently foreseeable, despite the lines and the pressure of the tugs to port, that the defendant was bound to maintain constant watch over the aft line and to pay it out, in the face of testimony, offered by plaintiff, from the person having the most direct knowledge of the wire's condition, ABS Cooper, that he saw no reason for doing so. Even if the ship moved, as Captain Newman hypothesized, this would not cast the Marine Duval in negligence absent proof of a duty to anticipate the movement or a failure properly to respond to it. Cf. Banton v. Kawasaki Kisen, K.K., 1975 A.M.C. 1658, 1660-61 (E.D.Pa.1975) (swells caused nondefective line to part although line was put to proper use). Such evidence was wholly lacking. The inference that there was no breach of duty on the part of the Marine Duval is entirely consistent with ABS Cooper's failure to notice undue strain on the wire; the lack of any indication that untoward ship motion, if in fact any occurred, was noticed in time to take corrective action; the general evidence that Marine Duval's docking procedures on the night of the accident were routine in all respects; and Captain Newman's testimony that shears, see note 6 Supra, are sudden and unpredictable.
 
 
 13
 Beyond her primary allegation of negligence in the operation of the aft winch and line, plaintiff has advanced a second theory on appeal, namely, that Marine was under a duty to warn McMillan "of the danger involved in the tying up procedure" meaning presumably a duty to warn McMillan to move to the far side of the mooring dock as his three companions had done.[7] Chief Mate Hoffman's recollection was that, perceiving McMillan to have been "in a bad spot," he had warned "Keep clear." The jury was not bound to believe Hoffman's testimony, but its disbelief would simply mean that there was no evidence on the subject of warning. Assuming Arguendo that Marine could be held liable for failure to warn an employee of the terminal operator against the risk of a line's snapping, it was plaintiff's burden to show that Marine had not issued an adequate warning not Marine's to show that it had. Moreover plaintiff did not press this theory during the trial, the judge did not instruct upon it, and plaintiff took no exception to her failure to do so. Plaintiff cannot support the submission of her case to the jury on a theory of negligence which was not raised at trial with sufficient clarity to enable defendant to respond. See Universe Tankships, Inc. v. United States, 528 F.2d 73, 75-76 (3 Cir. 1975).[8]
 
 
 14
 In essence plaintiff's case required the jury not only to disbelieve Chief Mate Hoffman and ABS Cooper but to believe the opposite of what they had said, i. e., that despite Hoffman's deposition testimony that he could not recall any movement on the part of the Marine Duval save for her even progress to port under the pressure of the tugs, she was in fact moving forward (although her engines were stopped) or to starboard (despite the pressure of the tugs); and that despite ABS Cooper's written statement that he noticed no undue strain on the wire, in fact the wire was being strained to the breaking point. One is inevitably reminded of Judge L. Hand's statement in Dyer v. MacDougall, 201 F.2d 265, 269 (2 Cir. 1952):
 
 
 15
 (A)lthough it is . . . true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him. This is owing to the fact that otherwise in such cases there could not be an effective appeal from the judge's disposition of a motion for a directed verdict.
 
 
 16
 Indeed, in the present case a directed verdict is even more appropriate in one respect. The Dyer example required that the jury's evaluation of demeanor evidence yield to the opposing party's right to effective appeal from a disposition of a motion for a directed verdict. Here the testimony of Hoffman and Cooper was in writing. Thus, there is no danger of shunting aside the jury's considered evaluation of demeanor evidence necessarily outside the record.
 
 
 17
 Although it is rarely possible to find a precedent directly on point with respect to a plaintiff's failure to sustain the burden of proof with respect to negligence, Marvin v. Central Gulf Lines, Inc., 554 F.2d 1295 (5 Cir. 1977), Cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978), comes very close indeed it is A fortiori in one respect, namely, that Marvin was "a Jones Act plaintiff suing in negligence" who "shoulders a lighter burden than his counterpart on land would carry." 554 F.2d at 1297, citing Gilmore & Black, Admiralty, §§ 6-35, 6-36 (2d ed. 1975). Here, as in Marvin, there is no evidence that the crew of the Marine Duval did anything they should not have done or failed to do anything they should have done. The Marvin court's distinction of cases in which recovery had been allowed for injury caused by a sudden movement of a line or rope, 554 F.2d at 1298-99, is also illuminating. In each of those cases, "the plaintiff seaman was able to present some evidence supporting some theory of negligence on the part of some employee for whose actions the employer was liable." Id. at 1299. When, as here, there is simply no basis for finding fault on the part of the ship, the harborworker's sole remedy is that afforded by the LHWCA, in this instance 33 U.S.C. § 909; no other conclusion is compatible with Congress' direction that recovery against the ship may be had only on proof of negligence pursuant to land-based standards.
 
 
 18
 The judgment is reversed and the case remanded with directions to enter judgment n. o. v. in favor of defendant.
 
 
 
 [1]
 These included whether it was error to have denied Marine's motion for summary judgment on the basis that because of an alleged undissolved prior common law marriage of Edgar's, plaintiff was not his widow; whether the verdict was clearly against the weight of the evidence; whether the district court erred in withdrawing the issue of McMillan's contributory negligence from the jury; whether because of the linguistic deficiency of one juror, the jury was improperly constituted; numerous questions about the award for compensatory damages; and whether, despite Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), the effect of the 1972 amendments to LHWCA, Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), and Ivy v. Security Barge Lines, Inc., 585 F.2d 732 (5 Cir. 1978), see also Westcott v. McAllister Bros., Inc., 436 F.Supp. 1039 (S.D.N.Y.1978); Giglio v. Farrell Lines, Inc., 424 F.Supp. 927 (S.D.N.Y.1977), is to prevent or limit to "primarily symbolic" amounts, 436 U.S. at 619 n. 4 and 625 n. 20, 98 S.Ct. 2010, awards for loss of consortium in actions under § 905(b)
 
 
 [2]
 There was no evidence that this procedure was unsafe
 
 
 [3]
 The break occurred over the dock, about a foot short of the loop securing the line to the bollard
 
 
 [4]
 A line is "end-for-ended" when it is rewound on the drum of a winch after the lead and drum ends of the line have been reversed
 
 
 [5]
 Plaintiff disclaimed reliance on the principle of Res ipsa loquitur in the trial and does not rely on it here. Reliance on Res ipsa loquitur might have led plaintiff to a different evidentiary strategy, notably with respect to the condition of the wire, but it would not have altered plaintiff's fundamental burden of proof. See 1A Benedict, Supra, at 6-25
 
 
 [6]
 This argument derives from testimony by Chief Mate Hoffman that a vessel is subject to occasional "shears" in Tampa Bay during November and that such shears described as a kind of eddy would have tended to pull the Marine Duval to starboard. However, Hoffman also testified that he could not recall any movement of the ship at the time of the accident other than its tug-assisted lateral progress to port. Captain Newman's testimony was to the same effect
 
 
 [7]
 Indeed, plaintiff appears to advance yet a third theory of negligence on appeal: that Marine allegedly breached a duty to provide McMillan with "a safe place to work." On inspection, however, this purportedly distinct theory melds with the allegation of negligence in the operation of the winch and line. To the extent that plaintiff may have meant something more, § 905(b) of the LHWCA leaves the primary responsibility of ensuring safety on the docks to the dockowner and not the shipowner. See Rich v. United States, 596 F.2d 541, 554-55 (3 Cir. 1979). The same also vitiates plaintiff's assertion that Marine was under an extended "duty to warn" McMillan to don a life preserver and replace his rubber boots. As the court held in Rich, id. at 554, "in order to impose liability on the vessel owner under Section 905(b), we must be sure that it and not the stevedore is in the position best able to prevent similar accidents from arising in the future."
 
 
 [8]
 These considerations are similar to the policies underlying the principle that new issues may not ordinarily be raised on appeal. As the Supreme Court observed long ago in that context:
 (o)ur procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there on issues upon which they have no opportunity to introduce evidence. Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941).
 Here, for example, plaintiff's brief makes much of the point that McMillan "was not a longshoreman" but "a sandblaster doing maritime work." Defendant was able to respond in this court only with an employment card showing that McMillan had been working at the terminal since 1948 and the testimony of Annie McMillan acknowledging he had worked on ships during that time. If the issue of failure to warn had been raised at trial, Marine would have been able to develop McMillan's docking experience in greater detail.