Jacob **SCHYBINGER**, Plaintiff-Appellee,

v.

**INTERLAKE STEAMSHIP COMPANY,**
Defendant-Appellant.

No. 12700.

United States Court of Appeals
Seventh Circuit.

Dec. 29, 1959.

Harlan L. Hackbert, Robert L. Hesse, Chicago, Ill., Robert G. McCreary, Cleveland, Ohio, Stevenson, Conaghan, Hack-

bert, Rooks & Pitts, Chicago, Ill., and Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for appellant.

Milton S. Padway, Milwaukee, Wis., for appellee.

Before SCHNACKENBERG and KNOCH, Circuit Judges, and PLATT, District Judge.

PLATT, District Judge.

The jury returned a verdict of $15,-000.00 for the plaintiff, Jacob Schybinger, on the first count of the complaint which was based upon the Jones Act. (46 U.S.C.A. Ch. 18, § 688.) Judgment was entered on the verdict, and the defendant-appellant's motions for judgment notwithstanding the verdict and for new trial were denied. The court sitting in Admiralty, without jury, entered judgment for the plaintiff for $732.00 on the second count of the complaint which alleged facts to recover damages for maintenance and cure.

The defendant, Interlake Steamship Company, in its appeal maintains:

I. The court erred in denying defendant's motion for judgment n.o.v., or in the alternative for a new trial, for the reasons:

(1) That the verdict was based upon fabricated testimony and was contrary to the manifest weight of the evidence.

(2) That the plaintiff failed to prove that the negligence of the defendant proximately caused the injuries; and

(3) That the court gave erroneous instructions to the jury.

II. The court erred in assuming that it was bound by the verdict on Count I, and entered judgment on Count II for the plaintiff without findings of fact and conclusions of law.

In order to determine the defendant's contentions it is necessary that the evidence in the case he reviewed.

The plaintiff, Jacob Schybinger, testified in substance as follows: He was a wheelsman on the Steamer Henry G. Dalton from March, 1952 to May 6, 1952. The Dalton was an ore boat, 575 feet long and 60 feet wide, with a forward house on the ship, between the forward winch and the bow of the vessel and a deckhouse between the forward winches and after winches. He was in good physical condition up to May 2, 1952. He was examined by a company doctor on board in March, 1952, and was found to be in good health. When Drydocking at Detroit on May 2, 1952, Hartley, a deck watch, took control of the forward winch while plaintiff relayed signals from the dock foreman to him. Hartley turned on the steam valve too fast. The plaintiff, not knowing the steam valve to the winch was open, stepped across the steel cable to help when it became taut, and the cable caught him between the legs striking his left leg and left testicle and tearing his dungarees. It knocked him down and dragged him about four or five feet. He jumped up and operated the winches for about ten minutes. He reported the accident to his first mate, John Friend. He then went down to the bathroom, observed his left testicle was red, cut and scratched, and he put "Seaman's salve" on it. He changed clothes and reported to the first mate that he had a bad back, and should see a doctor. The first mate told him to take it easy and he would be all right. On May 5 in order to ease the pain he became intoxicated. On May 6 he was fired. While still intoxicated he insisted upon going to the captain to obtain a certificate for medical care. He told the captain he was injured on deck and the captain made out the accident report. Friend, who was with them, insisted that he write he was injured when he "Fell down the ladder." He received the medical certificate from the captain and went to the hospital in Detroit, where he was examined, and being drunk was told to come back the next day. He did not return to the hospital, but shipped out on the Frontenac on May 9. He had severe pains but kept working. His left testicle swelled and was very painful. He went to a doctor who gave him a shot of penicillin and told

him to go to a hospital as soon as possible. He was unable to work after the first day and was put ashore at Duluth and he returned to his home in Milwaukee. The next day he went to the United States Public Health Hospital in Chicago (Chicago Marine Hospital) where he was treated. Later an operation was performed cutting the left spermatic cord and removing the left testicle. After he left the hospital he returned home and did not work until a couple of days prior to Thanksgiving. He was unable to do outside work.

Maude Schybinger, wife of plaintiff, testified that the plaintiff was in good physical condition prior to May 2, 1952, and was capable of carrying out his marital relations, but after he returned to Milwaukee he was unable to do so.

Dr. L. J. James, a witness for the plaintiff, testified that he examined and attended the plaintiff after he came back from the hospital in Chicago. He stated that he was advised by the plaintiff that he had been struck by a winch cable on a boat. The doctor on direct examination was asked:

"Q. Did you form an opinion, with a reasonable degree of medical certainty, as to whether or not the findings at that time were the result of trauma? A. One would be faced with a problem there, of course—

"Q. Do you have an opinion, Doctor? A. My opinion was that it was directly the result, directly the result of injury.

"Q. And it is your opinion—do you have an opinion as to whether or not it was the result of the striking of Jacob Schybinger by a cable? A. Well, that would be hearsay, as far as I am concerned. A cable should or could give that kind of an injury very well. It made it seem very logical.

"Q. Directing your attention, assuming that Jacob Schybinger was struck by a cable on May 2, 1952, with a reasonable degree of medical certainty, could that be a competent cause to bring about the type of injuries that you observed on your initial examination? A. Oh, sure it could".

The cross-examination of Dr. James will be referred to later.

The clinical reports of the Chicago Marine Hospital showing admission of the plaintiff to the hospital on May 22, 1952, was introduced in evidence by the plaintiff and reads in part as follows:

"Patient had injury on 5/2/51 when he was struck with one or two shovelfulls of iron and was knocked 3-4 feet to deck. Was admitted to this hosp. for study and Rx/ Since this accident he claims he has not been any good.

"2-3 weeks after patient left hospital right testis became swollen sore and tender. This cleared up in 2-3 weeks with Rx. Patient has had occ hematuria since last admission.

"In Feb. '52 right testicle again became swollen and tender and swelled to size of small orange, was red and painful. Patient treated this with hot sitz baths, and penicillin and it cleared up.

"Patient then was all right until 5-14-52 when he noted some slight hematuria. Left testicle then became swollen red and tender. Swelling occurred quite rapidly and the testis became very large and swollen. Patient had noticed that testis was mishapen (almost) like a dumbell) before it began to swell.

\* \* \* \* \* \*

"5/26/52. *Exam* reveals left testicular area and adjacent cord (up to ext. ring) tautly swollen (or distended) and extremely tender and of increased warmth. Right testicle feels normal."

"The patient gives rather a bizarre story—first stating that the testicle began to swell spontaneously following a short episode of hemituria. Later, retracting this story, he stated the swelling followed an injury sustained on May 2, 1952.

At this time, the testicle began to swell and become painful. The patient was treated as an out-patient, both in Detroit and Duluth at the PHS station. * * * "

Howard Hartley, a witness for the defendant, testified that he was a deck hand on the Dalton, and did not operate the winches during the dry-docking on May 2; that he did not see an accident involving the plaintiff on that day; that he was supposed to help handle the winches, and that he had helped when needed although he was inexperienced; that he could have been in the vicinity of the winches when the alleged accident occurred; that he had never taken them over entirely but just assisted.

George F. Naumann, a witness for the defendant, testified that he was a deck watch at the forward winch when it was going into dry dock; that the first mate was also there; that he did not recall seeing the plaintiff on deck during the docking operation; that he did not observe any mishap. He testified that he saw the plaintiff fall down the ladder to the dunnage room a few days after the claimed injury, but changed his testimony later and said he did not actually see him fall; he heard a noise, looked and saw the plaintiff getting up.

Robert Melvin Magnuson, a witness for the defendant, testified that he was the vessel master; that he did not witness any mishap at the forward winches; that he noticed Schybinger was on deck during the docking operation; that on May 6 he reported to him that he had been injured on board; that he made an accident report on that date but the plaintiff would not give any definite particulars. He told him "You got to put something [down]." The plaintiff finally wrote "Fell down ladder going to my room." The plaintiff told him that the accident took place on deck. Plaintiff was intoxicated at the time and looked aggravated. Plaintiff advised him that he was hurt and wanted a certificate for the hospital; that he had

pain and thought he was ruptured. A hospital certificate was issued to him.

▉ Clarence Friend, a witness for the defendant, testified that he was the first mate on the Dalton on May 2, 1952; that during the dry-docking he supervised the handling of the after winches, that he knew of no accident involving the plaintiff; that no report was made to him and that he first learned of the claimed injuries when the plaintiff reported to the captain on May 6.

Douglas Nugent, a witness for defendant, testified that he was third mate on the Dalton on May 2, 1952; that he believed that he was at the forward winches during the dry-docking; that he observed the plaintiff at the forward winches; that he did not remember a mishap in the operation of the forward winches.

Clarence Fischer and Norman Matthews, witnesses for the defendant, testified that they were roommates of the plaintiff; that plaintiff and Fischer had a quarrel on May 5 while he was intoxicated; that neither of them observed the injuries to the plaintiff.

The medical report of the hospital in Detroit was introduced in evidence by the defendant and the doctor's notes are set forth as follows:

"5/6/52 Patient staggers in with strong alcoholic breath. Says he fell on boat yesterday and 'ruptured' himself. Says he has been drinking for several days. Difficult to obtain history of time and events. Doesn't know how he got here.

"P. E. reveals no serious head or body injury. No ruptures or evident genital injury found. (Marked Rhinophyma) FFD (now inebriated-markedly)."

The defendant also introduced in evidence the sickness report of the plaintiff while on the S.S. Frontenac, which reads in part as follows:

"[O]n the 15th day of May 1952 I was bothered with a pain and swelling in my left testicle. I was sent to Dr. Swanbeck at Huron Ohio.

He said I had an infection and gave me a shot of peni*cill*ium. Said it might clear it up. But May 18 going up Lake Superior it got worse. On arrival at Superior was sent to Marine Doctor."

The district court did not err in denying the defendant's motion for directed verdict and for judgment notwithstanding the verdict because the verdict was based upon false testimony. A mere scintilla of evidence is not sufficient to submit a case to the jury, but here there was sufficient evidence to sustain the verdict and the issue depended upon the credibility and weight of the evidence. Thus, the trial court was justified in submitting the case to the jury. Gunning v. Cooley, 1929, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720. Neither the trial court nor the reviewing court can reweigh the evidence because the jury could have come to a different conclusion, or because the court believed a contrary verdict would be more reasonable. Tennant v. Peoria & P. U. R. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Lavender v. Kurn, 1946, 327 U.S. 645, at page 653, 66 S.Ct. 740, at page 744, 90 L.Ed. 916. While these two cases were decided under Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. the same rules of law are applicable under the Jones Act. Ferguson v. Moore-McCormack Lines, 1957, 352 U.S. 521, 523, 77 S.Ct. 459, 1 L.Ed.2d 515. The plaintiff's testimony was sufficient proof to take the case to the jury. There was conflicting evidence but it was a question for the jury to determine whether the accident occurred as plaintiff contended.

■ Defendant further contends that a new trial should have been granted because the plaintiff's testimony was false, the mishap did not occur, and the verdict is contrary to the manifest weight of the evidence. The falsity of the plaintiff's testimony was a plausible argument to be made to the jury but it cannot be considered by this court. The granting of a motion for new trial is within the sound discretion of the trial court. The plaintiff is entitled, after the verdict, to have the evidence viewed in the most favorable light to support the verdict. The injury to the plaintiff could have occurred as the plaintiff testified. Hartley directly contradicted the plaintiff but the other witnesses might not have seen the occurrence. Since the trial court saw and heard all the witnesses testify it was in a position to weigh and determine the credibility of all the witnesses. We do not feel the evidence justifies this court in holding that the trial court abused its discretion in denying a new trial. Mihalchak v. American Dredging Company, 3 Cir., 1959, 266 F.2d 875, 878.

■ The defendant further maintains that there was no proof that the injury received was proximately caused by the defendant's negligence. Counsel insists that after the cross-examination of the plaintiff's physician, Dr. James, there was not sufficient evidence to support the causal connection between the defendant's negligence and the plaintiff's injury. On cross-examination Dr. James was asked these questions:

"Q. Did you ask him whether he ever had any trouble with his testicles before the date of the accident which he claimed? A. Yes, He denied that. * * *

"Q. And if in fact he had had trouble with one of his testicles and if in fact one of the testicles within a month prior to the alleged accident had swollen up to the size of an orange, was red, painful, that would influence your opinion, I would take it, in the case? A. It certainly would. * * *"

Counsel in this last question assumed that Schybinger had trouble with one of his testicles within a month prior to his claimed injury. There does not seem to be any substantiation in the record for this assumption. The clinical record of the Chicago Marine Hospital dis-

closes that he had difficulties in February, 1952, before his employment on the Dalton. This record also discloses that on May 22, 1952 the right testicle was normal. Counsel in cross-examination also questioned Dr. James as follows:

"Q. And assume further from what you said, Doctor, the part of the background which you took to be true in the case, would include the fact that the man was struck in the testicle with sufficient severity, both in the testicle and on the leg with sufficient severity to then and there disable him, at least from immediately working? A. Well, no, not all of that, probably. You could have a nasty—a nasty, stinging injury there that would give you some slow bleeding into the tunica vaginalis and subsequently break down and cause abscess formation, but there certainly should be some evidence of injury there. That thigh should have shown some evidence of injury."

Counsel for defendant erroneously concludes "Dr. James assumed that any blow sufficient to cause the later trouble [injury to the left testicle] would have prostrated plaintiff with pain, while actually under his story he was up in a flash calling signals and ready to run the next play." The testimony of Dr. James, which we have heretofore set out, when analyzed does not bear out counsel's conclusion that he would have been immediately disabled. He expressly answered that "Well, no, not all of that, probably." Assuming that there were inconsistencies in the testimony of Dr. James, it did not destroy the probative value of his testimony on direct examination, that the injury to the left testicle was probably caused by being struck by the steel cable. In determining the causal connection between the negligence and the injury this testimony of Dr. James must be considered with the testimony of the plaintiff, that he was well physically when he started to work on the Dalton, and the physical examination by the defendant's physician confirmed that. This court is not

in a position, as a matter of law, to conclude that there was not sufficient evidence to prove the causal connection. See Chicago Great Western Railway Company v. Smith, 8 Cir., 1955, 228 F. 2d 180.

The defendant next complains that the court's instruction on damages in referring to the life expectancy of the plaintiff, was not supported by evidence and "induced [the jury] to the view that the court felt plaintiff was entitled to some damages." The defendant does not contend that the verdict was excessive. This court does not approve of this instruction or any instruction which is not based upon the evidence.

"[I]n jury trials erroneous rulings are presumptively injurious, especially those embodied in instructions to the jury; and they furnish ground for reversal unless it affirmatively appears that they were harmless." Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 82, 39 S.Ct. 435, 437, 63 L.Ed. 853, 856.

In determining whether the jury was confused on the question of liability and whether "it affirmatively appears" the error was harmless, the charge must be viewed as a whole. The court also instructed the jury:

"The fact that I have submitted this case to you and have here given you instructions on the subject of the plaintiff's injuries * * * is not to be taken by you as any intimation by the Court * * * of any liability for the injury complained of. This is a matter for you to determine."

And further,

"You are not to be concerned with the question of damages unless and until you first find from the evidence, under the instructions of the Court, that the defendant is liable."

These two instructions admonished the jury to consider the question of liability first before they considered the question of damages, and the jury could not

have been misled in determining liability. Moreover, the court gave the jury a correct instruction on damages, to which there was no objection. This instruction was as follows:

"If you find for the plaintiff, then in determining the amount of his damages, the jury have a right and you should take into consideration all the facts and circumstances proved by a preponderance of the evidence before you pertaining to such damages.

"You should consider the nature and extent of the plaintiff's injuries so far as the same are shown by preponderance of the evidence to have directly resulted from the accident in question, his loss of income, if any, his loss of health, if any, resulting from the injury, his future loss of health, if any, and his future suffering, if any, reasonably certain as a result of the injury, and you may find for him such sum as in the judgment of the jury, under the instructions of the Court, will be fair compensation for the damages he has sustained, if any, and which, it is reasonably certain he will sustain, if any, on account of the injury."

We conclude that the defect in the charge to the jury was harmless and did not affect the substantial rights of the parties, since the defendant did not complain that the verdict was excessive in amount. Rule 61, Fed.Rules Civ.Proc. 28 U.S.C.A. See Reiner v. Northern Pacific Terminal Co. of Oregon, 9 Cir., 1958, 259 F.2d 438; Matanuska Valley Lines v. Neal, 9 Cir., 1957, 255 F.2d 632. The judgment on Count I of the complaint must be affirmed inasmuch as we find no prejudicial error in the record.

■ This brings forward the error assigned by the defendant that the district court entered judgment for $732.-00 for maintenance and cure upon Count II of the complaint without findings of fact and conclusions of law. This count was a separate and distinct action and

it arises out of the employment. Mullen v. Fitz Simons & Connell Dredge & Dock Co., 7 Cir., 191 F.2d 82, again on appeal in 1952, 199 F.2d 557. The judgment on Count I of the complaint was not conclusive of the issues under Count II. Sulentich v. Interlake Steamship Company, 7 Cir., 1957, 257 F.2d 316, 318. Admiralty Rule 46½, 28 U.S.C.A. states in part: "the court of first instance shall find the facts specially and state separately its conclusions of law thereon." To the same effect see Koehler v. United States, 7 Cir., 187 F.2d 933, again on appeal in 1953, 200 F.2d 588; Victory Towing Company, Inc. v. Bordelon, 5 Cir., 1955, 219 F.2d 540; Matton Oil Transfer Corporation v. The Dynamic, 2 Cir., 1941, 123 F.2d 999. The judgment on Count II must be reversed and remanded to the district court to hear additional evidence, if necessary, and enter findings of fact, conclusions of law and judgment.

Judgment on Count I is affirmed and judgment on Count II is reversed and remanded for further proceedings consistent with the views expressed herein.