**JUNEAU SQUARE CORP., Wil-Ten Co.,** **Inc., Ralph W. Conway, Hal Bradley &** **Associates, Inc., Emil Bartel, Anna Bartel, Vione Perry, as Administratrix of** **the Estate of Thomas H. Perry, Plaintiffs,**

v.

**FIRST WISCONSIN NATIONAL BANK** **OF MILWAUKEE, First Wisconsin De-** **velopment Corporation, First Wisconsin** **Corporation, Marshall-Michigan Compa-** **ny, Inc., Marshall-Wisconsin Company,** **Inc., Defendants.**

Civ. A. No. 72–C–533.

United States District Court,
E. D. Wisconsin.

July 31, 1979.

George P. Kersten and E. Campion Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiffs.

W. Donald McSweeney and John J. Voortman, Schiff, Hardin & Waite, Chicago, Ill., for First Wisconsin and Marshall-Michigan defendants.

James A. Urdan and William ,A. Stearns, Quarles & Brady, Milwaukee, Wis., for Aetna defendants.

## MEMORANDUM AND ORDER

WARREN, District Judge.

The plaintiffs commenced this action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, alleging that the defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and Section 7 of the Clayton Act, 15 U.S.C. § 18.

Subsequently, summary judgment was granted in favor of the defendants on the claim arising under Section 7 of the Clayton Act. The first jury trial in this case commenced on May 3, 1976. At the conclusion of plaintiffs' case, the Court granted defendants' motions for directed verdicts on the monopoly claims asserted under Section 2 of the Sherman Act. The Court also granted the motion for directed verdict filed on behalf of the Aetna Casualty & Surety Company.

The remaining claims—the restraint of trade violations asserted under Section 1 of the Sherman Act—were submitted to the

jury at the close of the evidence.[1] The jury returned its verdict in favor of the plaintiffs on October 1, 1976. The jury found that the First Wisconsin defendants[2] and Marshall-Michigan Company, Inc. conspired to unreasonably restrain trade in the leasing, development, construction and operation of office rental space, and in the financing for the development of office buildings. The Aetna Life Insurance Company was the only defendant not found to be a member of the conspiracy. Judgment was duly entered on October 26, 1976.

Following the entry of judgment, various post-trial motions were filed with the Court. On July 29, 1977, after extensive examination and analysis of the facts and evidence presented, the Court granted the motion of the First Wisconsin defendants and defendant Marshall-Michigan Company, Inc. for a new trial in the interests of justice. The Court denied plaintiffs' motion for a new trial as to Aetna Life Insurance Company. *Juneau Square v. First Wisconsin National Bank of Milwaukee*, 435 F.Supp. 1307 (E.D.Wis.1977).

On March 20, 1978, a second jury trial commenced which lasted until June 15, 1978. On June 19, 1978, the jury returned a verdict in favor of the defendants. The jury found that the defendants did not enter into a contract, combination, or conspiracy with any other person which unreasonably restrained trade or commerce in the leasing of office rental space in the central business district of Milwaukee. On November 3, 1978, the Court entered judgment in this action.

On November 13, 1978, plaintiffs filed a motion for a new trial on all issues pursuant to Rule 59 of the Federal Rules of Civil Procedure. In support of their motion for a new trial, plaintiffs allege that the Court committed numerous prejudicial errors with respect to jury instructions, evidentiary rulings and other trial management decisions.

In order to facilitate an orderly discussion of plaintiffs' grounds for a new trial, the Court will address these grounds, under the following groupings, as utilized by the plaintiffs:

(1) Alleged instructional errors.

(2) Alleged errors in rulings on evidence.

(3) Alleged errors in trial management.

■ A timely motion for a new trial is addressed to the sound discretion of the trial court. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Schybinger v. Interlake S.S. Co.*, 273 F.2d 307 (7th Cir. 1959).

Rule 61 of the Federal Rules of Civil Procedure provides that:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is grounds for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice.

■ The question of whether error is "harmless" is to be resolved in the context of the individual case. Where it appears that error in no way influenced jurors or had but a slight effect upon them, the verdict and judgment are to be affirmed. *International Merger & Acquisition Consultants, Inc. v. Armac Enterprises, Inc.*, 531 F.2d 821 (7th Cir. 1976). *See, also Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ Thus, under rule 61, a new trial should not be granted unless the court finds that refusal to take such action is inconsistent with substantial justice. *International Merger & Acquisition Consultants, Inc. v. Armac Enterprises Inc., supra; Everett v.*

---

**1.** Section 1 of the Sherman Act, 15 U.S.C. § 1 provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**2.** The First Wisconsin defendants consist of the First Wisconsin Corporation and its wholly-owned subsidiaries the First Wisconsin National Bank of Milwaukee, the First Wisconsin Development Corporation, and the Marshall-Wisconsin Company, Inc.

*Southern Pacific Co.,* 181 F.2d 58 (9th Cir. 1950).

## ALLEGED INSTRUCTIONAL ERRORS

Plaintiffs argue that the Court erred in instructing the jury that the antitrust laws were enacted "for the protection of competition, not competitors" and that the plaintiffs were required to show actual injury to competition.

■ The following instruction on restraint of trade was given by the Court:

The anti-trust laws were enacted for the protection of competition, not competitors. The plaintiffs must, therefore, establish that the defendants' acts injured not only the plaintiffs themselves, but competition in the leasing of office rental in the central business district of the City of Milwaukee. (Tr. 10,578) [3]

The first sentence of this instruction is a direct quote from *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), which adopted the phrase, "competition, not competitors" from *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court's instruction was not a misstatement of the law.

■ In order to recover under the antitrust laws, a plaintiff must show "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra* at 499, 97 S.Ct. at 697.

Merely showing that one was a competitor of the defendants and was injured is not sufficient to show an antitrust violation under the Sherman Act. Plaintiffs must also establish an injury to competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra; Magnus Petroleum Co., Inc. v. Skelly Oil Co.,* 599 F.2d 196 (7th Cir. 1979); *John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir. 1977); *Redwing Carriers,*

*Inc. v. McKenzie Tank Lines, Inc.,* 443 F.Supp. 639 (N.D.Fla.1977), *Aff'd,* 594 F.2d 114 (5th Cir. 1979). As the court stated in *Magnus Petroleum Co., Inc. v. Skelly Oil Co., supra* at 204, evidence showing that "the effect upon competition in the marketplace was substantially adverse" is also required.

Contrary to plaintiffs' assertions, this instruction did not add another element to be proved by plaintiffs. A reading of the instructions as a whole shows that the Court specifically set forth the three elements that plaintiffs were required to prove by a preponderance of the credible evidence. These elements were:

(1) that the defendants contracted, conspired or combined to restrain commerce;

(2) that such restraint was unreasonable;

(3) that as a direct and proximate result of such a conspiracy to restrain trade, the plaintiffs suffered an injury to their business or property. (Tr. 10,571–10,572)

The Court also instructed the jury as to the question of proof of harm to the general public immediately after the challenged instruction on competition. The Court stated that: "A restraint (of trade) is unreasonable if it tends or is reasonably calculated to prejudice the public interest." (Tr. 10,578)

■ Plaintiff also argues that they were deprived of any opportunity to argue to the jury with respect to the challenged instruction because the Court decided to insert this "competition, not competitor's" language from defendants' proposed instruction 19A after the close of final arguments.

At the beginning of the final day of argument, the Court informed the parties that it was withholding its decision of defendants' proposed instruction 19A and taking it under advisement. The Court gave serious consideration to the position of both parties and ultimately concluded that lan-

---

**3.** Transcript citations, unless otherwise indicated, are to the transcript of the second trial which commenced on March 20, 1978.

guage from this instruction should be included in the final instructions given to the jury. Plaintiffs did not request that the Court rule on this proposed instruction prior to completion of their closing argument, although they did object to the instruction when the Court announced its decision.

The case cited by plaintiffs to support its position on this question, *Frederic P. Wiedersum Associates v. National Homes Construction Corp.*, 540 F.2d 62 (2d Cir. 1976), is clearly distinguishable from the facts of this action. In *Weidersum*, the court refused to inform the parties of any of the instructions it intended to give the jury, even though defense counsel requested the court to do so. Certain defense contentions about issues in the case were rejected by the court during the trial, but the court then instructed the jury on these contentions. Furthermore, the court gave totally inconsistent and conflicting instructions and failed to winnow out the requested instructions which it intended to adopt from those which it intended to reject.

Under these circumstances, the Second Circuit Court of Appeals granted a new trial, noting that it is fundamental error to give instructions which are hopelessly confusing and which fail "to provide even the barest legal guideposts to aid the jury in rationally reaching a decision." *Id.* at 66, quoting *McNello v. John B. Kelly, Inc.*, 283 F.2d 96, 102 (2d Cir. 1960).

In the present case, the Court finds that its augmenting of the restraint of trade instruction after the close of final arguments did not fundamentally change the instruction or constitute prejudicial error requiring a new trial. *See, Garland v. Material Service Corp.*, 291 F.2d 861, 863 (7th Cir. 1961).

After careful consideration, the Court concludes that its restraint of trade instruction, taken in context, was not erroneous but a correct statement of the law. The addition of the "competition, not competitors" language after the close of final arguments did not constitute prejudicial error.

■ Plaintiffs contend that the Court erred in instructing the jury that it was irrelevant whether various acts of the defendants violated laws other than the antitrust laws. Plaintiffs argue that the wrongfulness of specific acts done to accomplish a trade restraint is relevant in evaluating the defendants' conduct to ascertain whether a conspiracy exists and to determine whether the restraint of trade is reasonable.

In its instructions, the Court advised the jurors:

> During the course of the trial reference has been made to acts on the part of the various defendants and other persons that the plaintiffs claim were done as a part of a conspiracy to restrain trade, so as to injure plaintiffs in their business or property. You are to consider these acts, if you find they were indeed done by the defendants only if you also find that they were done in the course of and in furtherance of a conspiracy to violate the antitrust laws by unreasonably restraining trade. Whether or not these acts were violative of laws other than the anti-trust laws is irrelevant. If any of the defendants have committed any other wrongs and I do not suggest whether they have or have not, you should not consider the character of these acts under laws other than the anti-trust laws as I have defined and explained them in these instructions. (Tr. 10,586–10,587)

In this instruction, the Court explained to the jury that only those allegedly illegal acts done by the defendants in the course of and in furtherance of a conspiracy to violate the antitrust laws could be considered. Whether any of these acts also violated principles of tort law was not, in and of itself, determinative of an antitrust violation. Merely because a defendant's acts may have constituted a tort does not automatically make that defendant's acts violative of the Sherman Act.

This is what the Court instructed the jury. Such instruction was not erroneous.

■ Plaintiffs also argue that they were entitled to have this instruction on the ille-

gality of defendants acts as part of their theory of the case. It is clear that plaintiffs are entitled to have their theory of the case presented to the jury. *Florists Nationwide Telephone Delivery Network v. Florists Telegraph Delivery Assn.*, 371 F.2d 263 (7th Cir. 1967).

However, the Court gave the substance of the parties theories when it outlined the contentions of each of the parties at the outset of the jury instructions. (Tr. 10,556) Plaintiffs also argued their theories to the jury regarding the defendants' allegedly illegal conduct during closing argument.

The Court's instructions were geared to guiding and aiding the jury in its evaluation of the vast amount of evidence presented. Plaintiffs' and defendants' theories of the case were set forth by the Court. Accordingly, the Court finds that it did not err in its instruction concerning the alleged illegal or unreasonable acts of the defendants.

■ Plaintiffs assert that the Court erred in failing to give plaintiffs' requested instruction 16 regarding unfair competition as a per se violation of the Sherman Act. Plaintiffs state that the per se illegality of using unfair and illegal methods to destroy a competitor is well-established in case law, citing *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.*, 57 F.2d 96 (1st Cir. 1932); *cert. denied*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932) and related cases.

One problem with plaintiffs' position is that the Court considered and rejected plaintiffs' per se theories in the first trial and no new judicial authority has been presented to change the Court's earlier decision. In its prior decision, the Court explained that the per se theory announced in *Pick-Barth* has never been approved by the Supreme Court nor has it gained acceptance in most circuits. The Court also pointed out that, in light of *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir. 1974), there is some doubt as to whether the *Pick-Barth* rule is still good law. *See, Juneau Square v. First Wisconsin National Bank of Milwaukee, supra* at 1319.

Recent case law has also criticized the per se rule set forth in *Pick-Barth*. *See, Stifel, Nicolaus & Co. v. Dain, Kalman & Quail, Inc.*, 578 F.2d 1256 (8th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83 (5th Cir. 1978); *Redwing Carriers, Inc. v. McKenzie Tank Lines, Inc., supra*.

Moreover, the Supreme Court, in its recent decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, expressed reluctance to extend per se rules under Section 1 of the Sherman Act. In light of the foregoing, the Court finds that it did not err in refusing to instruct the jury about unfair competition as a per se violation of the Sherman Act.

Plaintiffs argue that Aetna should have been included in the new trial and that the Court should not have instructed the jury that "you may not find that Aetna Life Insurance Company was a member of the alleged conspiracy." (Tr. 10,575) Plaintiffs state they should have been permitted to prove and argue that Aetna had been used and manipulated by the other defendants. The Court precluded this evidence by written order of March 22, 1978 on the ground that such an assertion would require an amendment of the pleadings.

Plaintiffs contend that their third amended complaint was improperly construed by the Court, "a fair reading of which leaves ample room for proof of control or manipulation of Aetna by the defendants." (Plaintiffs' brief in support of motion for a new trial. p. 8).

■ A reading of this complaint does not show allegations of use and manipulation of Aetna. Furthermore, to allow plaintiffs leave to amend this complaint after the commencement of the second trial and over five years after the initiation of this action would not have served the interests of justice.

■ With respect to the exclusion of Aetna from the second trial, Rule 59(a) of the Federal Rules of Civil Procedure specifically authorizes the granting of a new trial

as to "all or any of the parties and on all or part of the issues."

The jury in the first trial found that Aetna was not a member of the conspiracy. In denying plaintiffs' motion for a new trial with respect to Aetna, the Court found that the verdict was not against the weight of the evidence. The Court noted, among other considerations, that the record contained no evidence of any communication between Aetna and the First Wisconsin defendants during the relevant period, much less an agreement to restrain competition and that there was no evidence indicating that Aetna was even aware of First Wisconsin's interest in the development during much of the relevant period. The Court also found that there were substantial business justifications for Aetna's subsequent refusal to continue financing the project. *See, Juneau Square v. First Wis. National Bank of Milwaukee, supra* at 1326.

The Court's rulings on evidence and its instruction relating to Aetna were in keeping with the Court's prior decision. The Court allowed plaintiffs to introduce certain evidence pertaining to Aetna but refused to permit plaintiffs to relitigate Aetna's involvement in the alleged conspiracy.

The Court concludes that it did not err in instructing the jury regarding Aetna and in precluding proof and argument that Aetna was controlled or manipulated by the other defendants.

█ Plaintiffs challenge the Court's mortgage foreclosure law instructions, alleging that it was erroneous in its overall impact and failed to provide the jury with a fair and accurate standard for evaluating the conduct of the parties.

Plaintiffs specifically object to the particular aspects of the Court's instruction dealing with the operation of acceleration clauses and extensions of time to cure defaults. Plaintiffs also assert that the instruction ignored the equitable character of the procedure and the considerable latitude vested in the Court in foreclosure actions.

The Court instructed the jury in part as follows:

The general purpose of a mortgage is to provide a security for payment of a debt or performance of an obligation. Thus, if a borrower is not able to pay the amounts due, the lender can look to the value of the property mortgaged to obtain payment. The law permits mortgages to be bought and sold and this right to transfer ownership of a mortgage is also important to its value. When a mortgage is in default, several things may occur. Holders of defaulted mortgages may grant the property owner additional time in which to discharge his obligations under the mortgage, but such extensions are entirely voluntary, are not required by law and may be made subject to any conditions the mortgage holder wishes to impose in order to protect its interest. If such an agreement is not made, the holder of the mortgage must invoke the aid of the Court to enforce the provision of it, of this mortgage agreement. The mortgagee is authorized by law to foreclose on that mortgage and requires the property owner to either one, pay the full amount of the debt immediately if the mortgage so provides or two, relinquish to the holder of the mortgage all rights in the mortgaged property.

If the failure to pay real estate taxes constitutes a default under the terms of a mortgage, and the mortgagee is entitled to payment of the full amount of the mortgage upon default, payment of the real estate taxes would not bar the mortgagee from maintaining a foreclosure action. A foreclosure suit is a legal proceeding supervised by a court. Rules of equity or fairness are applied to such proceedings to insure fair treatment of both the creditor and the debtor. If the judge finds that the property owner has defaulted on the mortgage, he will enter judgment in favor of the mortgage holder. The law allows the party against whom the judgment was entered to redeem his property by paying the amount of the judgment within one year. If the property is not redeemed, the mortgage holder may then have the real estate sold at a sheriff's sale in order to recover the debt due it. (Tr. 10,587–88)

The statement that extensions of time to discharge an obligation under a mortgage are voluntary and "not required by law" is not erroneous. Such extensions are not required by law and may, as the Court stated, be made subject to any conditions the mortgage holder wishes to impose. The operation of acceleration clauses was also correctly presented to the jury.

Contrary to plaintiff's contentions, the Court did not ignore the equitable considerations in a foreclosure action. Rather, the Court stressed that "rules of equity or fairness are applied to such proceedings to insure fair treatment of both the creditor and debtor." (Tr. 10,588)

After carefully examining its instruction on mortgage foreclosure law, the Court concludes that the instructions, as a whole, accurately and unbiasedly set forth the applicable law. The instruction provided the jury with a fair and accurate standard for evaluating the conduct of the parties.

■ Plaintiffs argue that the Court erred by unduly emphasizing their burden of proof in giving the "equal hypothesis" instruction and by thereafter giving the "inference upon inference" instruction.

The following "equal hypothesis" instruction was stated to the jury:

If from the evidence you cannot determine whether the allegations have been proved or not proved then your verdict should be for the defendants. (Tr. 10,-560)

Plaintiff relies on *South East Coal Co. v. Consolidated Coal Co.*, 434 F.2d 767 (6th Cir. 1970) to support its position that this instruction was redundant, confusing and should have been omitted. The district court in the *South East Coal Co.* case did not give the equal hypothesis instruction and the defendant appealed on this and other grounds. The court of appeals stated that the trial judge should have directed a verdict if he believed that the evidence on both sides was equal in weight. The court then explained:

It appears that the "equal hypothesis rule" is simply a negative way of phrasing the rule of law that a plaintiff must sustain his·burden of proof. Thus, if a plaintiff does not come forth with evidence, when considered in light of opposing evidence, from which a jury could infer the truth of an alleged proposition over its contraproposition, the plaintiff has not met his burden of proof. *Id.* at 777.

The Court finds the "equal hypothesis" instruction was not erroneous.

■ With respect to the "inference upon inference" instruction, the Court told the jurors:

A "reasonable inference" is defined as a process of reasoning whereby from the facts otherwise admitted or established by the evidence in the light of your common knowledge and experience, a reasonable and logical conclusion may be drawn that a certain fact is true. A reasonable inference is, therefore, to be thoroughly distinguished from a mere guess or conjecture. The law does not permit speculation. Moreover, on the basis solely of one inference so drawn a further inference may not be drawn.

In other words, you may not pile inference on inference, but may draw an inference only from facts or circumstances which you find to have been established by a preponderance of the evidence. (Tr. 10,561–62)

Taken in context, this instruction was not erroneous. It explained to the jury the distinction between reasonable inferences and mere speculation and correctly stated that inferences must be drawn from a factual basis. Plaintiffs' motion for a new trial on this ground must be denied.

### ALLEGED ERRORS IN RULINGS ON EVIDENCE

Plaintiffs challenge various evidentiary rulings of the Court and assert that these alleged errors necessitate the granting of a new trial.

Rule 103(a) of the Federal Rules of Evidence provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

■ Plaintiffs state that the Court erred in prohibiting plaintiff Jack Moertl, Jack Cisco, and Richard Krauss from testifying to the reasons given by sources of financing for declining to finance Juneau Square East. Plaintiffs argue that Moertl should have been allowed to testify to the reasons given to him by Mr. Tishmann for the loss of the Cooper-Horwitz financing and to the reasons given by Cisco for loss of the New York Life Insurance Co. (New York Life) financing. According to plaintiffs, Krauss should have been permitted to testify to the reasons given him by Faulkner of New York Life for the loss of the New York Life financing and similar testimony by Cisco should also have been allowed.

One of the primary reasons for the Court's decision to grant a new trial in this case in 1977 was that hearsay evidence prejudicial to the defendants had erroneously been admitted into evidence over defendants' strenuous objections. In particular, the Court cited the fact that Moertl was permitted to testify in the first trial about a conversation he had with Cisco about the loss of New York Life financing.

In this testimony, Moertl characterized a conversation he had with Cisco who was repeating a conversation he had with some unidentified person. This testimony clearly involved multiple levels of hearsay and was properly excluded by the Court in the second trial.

The testimony of Krauss and Cisco similarly involved conversations with persons who were repeating statements made to them by other sources. This is clearly hearsay and inadmissible. The fact, as plaintiffs assert, that each of the proposed witnesses were either spokesmen for the financial institutions involved or received the information from such spokesmen does not change the fact that they were repeating information received from another who received it from still another source.

This testimony sought to be introduced was clearly hearsay and would have been highly prejudicial to the defendants. The Court properly excluded this proposed testimony.

Contrary to plaintiffs' contentions, the Court did not require witnesses to change facts or testimony to accommodate any unrealistic sequence of events caused by the Court's excluding the above-described testimony. No error was committed in this regard.

■ Plaintiffs argue that Warren Stringer should have been allowed to give his opinion about the validity of Metropolitan Life Insurance Company's (Metropolitan) expressed reasons for refusing to finance Juneau Square East. Plaintiffs offered to prove through Stringer that, after several months of work on a financing package for Juneau Square, he received a letter setting forth "stereo-typed boiler plate" reasons for the turndown of the loan. Stringer stated that there was some other reason for the turndown, but he did not know what it was. However, he said the reason given "was not the genuine reason." (Tr. 2838–39)

Rules 701 and 702 of the Federal Rules of Evidence set forth criteria for the lay opinion and expert opinion testimony. In order to offer opinion testimony by lay witnesses, rule 701 provides that the witness' opinion must be (1) based on personal knowledge; and (2) must be helpful to the trier of fact. *See* Weinstein, Evidence ¶ 701[02] p. 701–10 (1978).

Stringer's proposed testimony did not meet this criteria and, therefore, was properly excluded by the Court.

Plaintiffs challenge various evidentiary rulings relating to Marshall-Michigan, including the exclusion of various portions of the depositions of Donald E. Boerema, Charles Pinto, and William Clark.

■ The Court has examined the trial transcript and its prior rulings, excluding certain sections of these depositions from the trial. Many of the sections excluded contained hearsay, speculation or lacked adequate foundation. The Court finds that these portions of the deposition testimony of Boerema, Pinto and Clark were properly excluded from the trial.

■ Plaintiffs challenge the Court's ruling on the Marshall-Michigan letter to Juneau Square tenants. As previously determined, whether an action violates principles of tort law is not, in and of itself, proof of a violation of antitrust law. The Court finds that it did not err in failing to instruct the jury that the letter sent by James Huber on behalf of Marshall-Michigan to Juneau Square was tortious.

Furthermore, the Court was not inconsistent in deciding that Judge Robert Landry's decision should be, excluded and in refusing to strike Huber's testimony regarding his rationale for sending the letter to the tenants. (Tr. 7856–61) Judge Landry's dicta regarding the procedure utilized by Marshall-Michigan was not relevant to this action and was prejudicial to the defendants. On the other hand, the Court reaffirms its position that Huber's thoughts and intentions at the time he drafted the tenant's letter is relevant with respect to his motivation. (See Tr. 7861)

The Court concludes that it did not err in its rulings regarding the Marshall-Michigan letter to tenants.

■ Plaintiffs assert that the Court's restrictions on plaintiffs' cross examination of John Sann was extremely prejudicial. Certain questions about documents were excluded by the Court because the witness had never seen the documents, and because questions about the documents were not raised during direct examination. (See Rule 611(b) of the Federal Rules of Evidence.)

After due consideration, the Court concludes that it did not err in setting certain limitations on the cross examination of Mr. Sann.

■ The Court also concludes that it was not in error to prevent plaintiff Moertl from testifying that the reason given to him by Aetna's attorney, James Urdan, for Aetna's entry of foreclosure judgment on January 4, 1972 was that Marshall-Michigan had entered its judgment the preceding day. Urdan could have been called as a witness by plaintiffs. In addition, the question of Aetna's decision to enter foreclosure judgment was not raised by plaintiffs when Urdan testified on behalf of the defendants. Finally, Aetna's rationale for entering its foreclosure judgment was not relevant to the issues in the second trial.

■ Plaintiffs contend that they should have been allowed to introduce evidence on the circumstances for the formation of Wil-Ten Associates. The Court considered plaintiffs' arguments at trial and declined to admit the evidence, stating that the evidence did not have sufficient probative value "that would justify the influence for which plaintiff would obviously be offering it." (Tr. 608)

The Court has reexamined its decision and finds that it did not err in excluding these prejudicial statements about the rational for the formation of Wil-Ten Associates.

■ The Court excluded plaintiffs' exhibits 491 and 533, which listed First Wisconsin's real estate holdings and Northwestern Mutual Life Insurance Company's (NML) real estate holdings in Milwaukee's central business district, respectively.

Plaintiffs argue that the size and power of these companies in the relevant market had an obvious bearing on the existence of a conspiracy and on the issue of the reasonableness of the restraint of trade. The

Court is not persuaded by plaintiffs' position. The fact that First Wisconsin and NML are large corporations with extensive real estate holdings in the central business district does not, of itself, support plaintiffs' allegations of conspiracy.

After careful consideration of the evidence and arguments of the parties, the Court finds that these exhibits were properly excluded. Even though the exhibits were inadmissible, plaintiffs were not foreclosed from all inquiry about these property listings and the relationship between NML and First Wisconsin. Plaintiffs had an opportunity to examine Richard Holscher on the First Wisconsin's real estate holdings (Tr. 5378–71) and Donald Mundt on the NML listings (Tr. 3893–96). Other exhibits pertaining to NML were introduced into evidence. *See* Px 523–532 and 537–544.

The Court, therefore, concludes that it did not err in excluding the exhibits listing the real estate holdings of First Wisconsin and NML.

Plaintiffs challenge various Court rulings relating to the New York Life financing. Specifically, plaintiffs state the Court erred in (1) excluding certain testimony of Moertl, Krauss and Cisco; (2) in its ruling on deposition and prior trial testimony of New York Life witnesses; (3) in excluding certain questioning of Edward Rose; (4) in excluding from evidence portions of plaintiffs' exhibit 408 and the handwritten notations on plaintiffs' exhibits 383 and 419; and (5) its evidentiary rulings relating to First Wisconsin's credit report to New York Life.

The Court has previously concluded that it did not err in excluding the testimony of Moertl, Krauss and Cisco regarding the alleged reasons for New York Life's turndown of the Juneau Square loan.

With respect to the deposition and prior testimony of the New York Life witnesses, the Court finds it did not commit prejudicial error warranting a new trial in refusing to permit certain testimony. To advise the jury that much of the questioning of the New York Life witnesses during their depositions was conducted by David Beckwith of

Foley & Lardner would have been unduly prejudicial, in addition to being irrelevant to the issues in this action. The Court had a similar problem with plaintiffs' exhibit 422, the Martindale-Hubbell listing showing that Foley & Lardner represented New York Life as of 1971.

The Court concludes its rulings on these questions were not erroneous so as to require the granting of a new trial.

■ Plaintiffs sought to impeach Rose's testimony to the effect that First Wisconsin's unfavorable credit report to New York Life was not a factor in the May 19, 1971 decision of New York Life to refuse financing and had not been discussed at this committee meeting. Handwritten notations on plaintiffs' exhibit 419, the committee brief of the meeting, indicate that the credit report had been discussed.

In his testimony, Rose stated he did not know who made the handwritten notations or when they were made (Tr. 8634–8639). In addition, the handwriting had not previously been identified. The Court therefore concluded that Rose could not be questioned on the contents of these notations.

Upon reconsideration, the Court finds that this ruling was not erroneous and plaintiffs are not entitled to a new trial on this ground.

■ The Court properly excluded the handwritten notations on plaintiffs' exhibits 383 and 419. The requirements of the business records exception to the hearsay rule, Rule 803(6) of the Federal Rules of Evidence, were not met in this instance. No testimony was presented about the identity of the writer of the notes nor did anyone testify that these notations were made in the course of New York Life's regularly conducted business and were a regular practice of the company.

■ With respect to plaintiffs' exhibit 408, the Lutz-Duncan memorandum, this memorandum was to be utilized to support plaintiffs' theory that the First Wisconsin defendants were attempting to interfere with the New York Life loan application.

In the first trial in this action, the Court granted a new trial in part because of the hearsay evidence of a highly prejudicial nature contained in this memorandum. The Court stated that several levels of hearsay were found in the memorandum and concluded that the "lack of trustworthiness and the prejudicial nature of this memorandum are self-evident." *Juneau Square Corp. v. First Wis. Nat'l. Bank, supra* at 1324.

After careful consideration of plaintiffs' arguments, the Court declines to change its earlier ruling. The Court finds that the memorandum contains prejudicial hearsay and was properly excluded by the Court.

According to plaintiffs, the basic accusation made in First Wisconsin's credit report to New York Life was that First Wisconsin was involved in the construction lending on Juneau Square and found that proceeds were not being used as indicated. Three witnesses were offered by defendants to justify this statement: Austin Lett, John Dickens and Alfred Little, author of the report. Only Little testified in person at the trial.

Dickens's prior trial testimony was read to the jury because he was unavailable as a witness pursuant to Rule 804(a)(4) of the Federal Rules of Evidence (Tr. 6412–16). Plaintiffs do not challenge the propriety of the Court's decision on this ground.

■ However, plaintiffs state that the Court should have required that the entire deposition testimony of Lett be read to the jury.

Rule 611(a) of the Federal Rules of Evidence provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

The Court exercised its discretion and allowed the parties to decide their trial tactics and the best way to present their evidence. The Court did not err in refusing to order that the entire Lett deposition be read into evidence in sequence.

■ Plaintiffs assert that they were allowed inadequate time to cross-examine Little and that the Court improperly quashed their subpoena of Little. Little, who had been waiting to be called to testify for two days, was finally called to the stand on Friday, May 26, 1978 at 4:26 P.M. The Court split the remaining time between plaintiffs and defendants.

During their cross-examination, plaintiffs were able to ascertain the source of Little's belief that Juneau Square had used funds for purposes other than had been indicated to the bank. Plaintiffs also were able to elicit the admission that if this underlying report was incorrect, then his statement to New York Life was also incorrect.

Plaintiffs then subpoenaed Little at the close of his testimony and defendants moved to quash the subpoena.

In ruling on this motion, the Court noted that the time constraints were, in part, necessitated by the extensive cross-examination of a prior witness, and that the Court had indicated to plaintiffs that they should consider curtailing this cross-examination. Nevertheless, the cross-examination of Sann continued until 4:25 P.M. (Tr. 8179).

Prior to deciding the motion to quash, the Court questioned Little, a Florida resident, who indicated it would be "very inconvenient" for him to return the following week. The witness also professed an inability to add anything further to the statements he had already made. (Tr. 8174–8177). In light of all these factors and the Court's uncertainty as to the validity of the service of the subpoena, the Court granted the motion to quash the subpoena (Tr. 8179–80).

After careful consideration, the Court now finds that plaintiffs were not unduly prejudiced by the time limitations and that the Court did not err in quashing plaintiffs' subpoena.

## ALLEGED ERRORS IN TRIAL MANAGEMENT

Plaintiffs contend that certain other decisions of the Court were highly prejudicial to the plaintiffs and necessitate the granting of a new trial in the interests of justice. Specifically, plaintiffs list the Court's time restrictions on the trial and closing arguments, the limitations placed on the cross-examination of certain witnesses and the alleged misconduct of defense counsel and defense witness Harold Shapiro.

### A. *Time Restrictions*

The second trial in this case commenced on Monday, March 20, 1978, at 2:00 P.M. Court recessed for the day at 6:45 P.M., after a jury of six plus four alternates had been selected. The Court blocked out some twelve weeks of its trial calendar for this trial. Plaintiffs had thirty-four days of actual trial time and the defendants had twenty days of trial time. Plaintiffs were allotted five hours for closing argument, including rebuttal, while the defendants had four hours for their closing argument. The plaintiffs request for a minimum total of six hours for argument was denied by the Court. (Tr. 10,149)

Plaintiffs assert that these time constraints denied them the opportunity to present their claims completely and fairly. Plaintiffs point out that defendants were permitted extensive cross-examination of witnesses called by plaintiffs but identified with the defendants and that they were required to read irrelevant portions of depositions counterdesignated by the defendants. In addition, defendants were allegedly permitted extensive voir dire. In the opinion of plaintiffs, all of this combined to further shorten their already too limited trial time.

The Court was very aware of the complexity of the case and the great quantity of evidence to be presented. These factors were taken into consideration in blocking out some three months for the trial. Two days were set aside for closing arguments.

The Court also recognized its responsibility to parties to other litigation pending before the Court. Considering the crowded dockets of the courts, the Court has a responsibility to exercise reasonable control over the amount of trial time allotted to litigants. Affording parties unlimited amounts of trial time prejudices other litigants before the Court who must then wait extra months before their cases come to trial. These factors must also be considered and were considered by the Court.

During the entire three months of trial, the Court handled its regular schedule of status reports, pretrial and final pretrial conferences, arraignments, and sentencings. Hearings on temporary restraining orders and preliminary injunctions were also scheduled as the need arose. To allow plaintiffs additional time for closing arguments would have cut into the Court's time allotted to other pending cases or necessitated the extension of closing argument to a third day. Under the Court's time schedule, each side's argument could be presented in one trial day. The Court did not err in restricting time for closing arguments and in setting very reasonable time limitations for the trial.

Furthermore, the Court finds that it did not err in requiring plaintiffs to read deposition designations and the counterdesignations by the defendants or in permitting defendants to conduct voir dires on revisions of plaintiffs' damage exhibit. Such decisions are discretionary with the Court and, in these instances, were designed to further the orderly presentation of the evidence. These decisions were not prejudicial to plaintiffs so as to necessitate a new trial.

In summary, the Court is not persuaded by plaintiffs' arguments that the time constraints prevented plaintiffs from fairly and fully presenting their case. The Court set aside a substantial amount of time for this trial with minimum interruptions. The amount of time was not unreasonably short, and the five hours allotted to plaintiffs for closing arguments did not unfairly prejudice the plaintiffs.

Therefore, the Court finds that the time constraints placed on the parties were rea-

sonable in light of all the facts and circumstances and did not deny plaintiffs a fair trial in this case.

### B. *Plaintiffs' Cross-Examination of Witnesses*

Plaintiffs also assert that they were unduly prejudiced when the Court limited the cross-examination of James Huber and George F. Kasten. Plaintiffs sought to question Huber about a matter outside the scope of his direct examination and the Court properly excluded this line of questioning. Rule 611 of the Federal Rules of Evidence. (*See* Tr. 7663–7672)

■ Plaintiffs wanted to confront Kasten with the deposition testimony of Holscher which allegedly contradicted Kasten's testimony. The Court did permit plaintiff to introduce the Holscher deposition excerpt later in the day at the end of Kasten's testimony. Under the circumstances, the Court finds that plaintiffs were not unduly prejudiced so as to be entitled to a new trial on this issue.

### C. *Alleged Misconduct of Witness and Defense Counsel*

■ Plaintiffs assert that the alleged misconduct of defense counsel, Peter Baugher, and of Harold Shapiro, a witness identified with the defendants, took place when candy was obtained from a juror while the Court, court staff, plaintiffs' counsel and the other defense counsel were engaged in conferences at the side bar.

According to plaintiff John Spoden, he personally observed Baugher obtaining candy or other snack food from a juror on two separate occasions during the trial. The first incident occurred when plaintiff Moertl was testifying and the second while Shapiro was testifying on April 12, 1978. Spoden also observed on April 12, 1978, that Shapiro made comments to the jury and obtained candy from a juror. (Spoden Affid. ¶ 2.)

When the Court was informed of these activities, the Court indicated it would instruct the jury about the candy problem. The Court also admonished Shapiro not to take any additional candy from any juror. (Tr. 2478)

Plaintiffs' counsel at the time asked that Shapiro be "admonished or requested from here on in not to do any other activity of that type" and that the bailiff monitor the jury box area during sidebar conferences. (Tr. 2476) Plaintiffs did not move for a mistrial at the time.

Plaintiffs state in their reply brief that plaintiffs' counsel did not become aware until after the trial that one of the defense counsel had repeatedly obtained candy from a juror. Had they known about this, plaintiffs assert, they would have asked for a mistrial or public admonishment of defense counsel.

In his affidavit, however, plaintiff Spoden states he observed defense counsel taking candy from a juror on two occasions, the last on April 12, 1978. Thus, plaintiffs had notice of defense counsel's activities at the time the Court instructed the jury about this type of conduct.

The Court did not condone these occurrences but, instead, took steps to correct the problem. Moreover, the Court finds that these occurrences were not unduly prejudicial to plaintiffs and do not alone warrant the granting of a new trial.

### D. *Other Alleged Prejudicial Errors*

Plaintiffs also cite in their brief several other errors allegedly committed by the Court during the presentation of evidence. With respect to the testimony of James Liek, the Court finds that his testimony was admissible and of probative value.

The Court also did not erroneously rule and comment upon plaintiffs' counsel's presentation or upon the reference to Arthur Anderson in the plaintiffs' damage presentation. Nor did the Court attempt to enhance the credibility of certain defense witnesses by asking friendly and rehabilitating questions. Rather, the Court's questions were designed to obtain clarification of issues or to elicit further explanation of a particular point.

■ Plaintiffs further assert that the exclusion of plaintiffs Spoden and Moertl

and their wives from the courtroom during the cross-examination of defense witness Huber was unduly prejudicial and erroneously suggested to the jury that these plaintiffs had engaged in some misconduct.

The Court is not persuaded by this argument. Plaintiffs Moertl and Spoden were only excluded for the few hours of the cross-examination of Huber because they were to be called as rebuttal witnesses and might be testifying as to the same transaction as Huber. Moreover, these plaintiffs were only excluded after the Court granted plaintiffs' motion to exclude Sann from the courtroom during the balance of Huber's testimony. (Tr. 7647–7651) Therefore, plaintiffs' motion for a new trial on this ground is denied.

Contrary to plaintiffs' contentions, the Court did not take an unduly restrictive view of the business records exception to the hearsay rule and other rules of evidence to the detriment of plaintiffs. Rather, the Court properly applied the rules of evidence fairly and impartially during the course of the trial.

In their post trial motion, plaintiffs also allege other errors warranting a new trial, although these grounds were not specifically addressed in their brief. Plaintiffs allege that defendants' attorneys, in their opening statement and closing argument, made numerous erroneous assertions of law and fact not supported by the record, thereby substantially prejudicing plaintiffs. The Court has examined the record and finds that the defendants' opening statement and closing argument to the jury were not prejudicial to the rights of plaintiffs.

With respect to the other grounds for a new trial, the Court has considered plaintiffs' arguments and finds that no error prejudicing the rights of the plaintiffs was committed.

In conclusion, the Court finds, after careful examination, that the alleged errors in the trial of this action with respect to jury instructions, evidentiary rulings, and other trial management decisions, were basically fair to both sides and were not unduly prejudicial to plaintiffs so as to require the granting of a new trial in the interests of justice. Moreover, the Court is convinced that the cumulative effect of the trial time restrictions and the alleged errors of the Court are not of sufficient substance and magnitude to warrant ordering a new trial.

Ultimately, the Court has the duty to see that there is no miscarriage of justice. Only if the Court is convinced that there has been, should it set aside the jury's verdict.

In this case, the Court has exhaustively examined the testimony and evidence presented and has carefully considered the arguments of plaintiffs in support of their motion for a new trial. In the final analysis, the Court finds that no miscarriage of justice occurred and that the interests of justice are served by upholding the jury's verdict in this action. Accordingly, the Court hereby orders that plaintiffs' motion for a new trial must be and is hereby denied.